**James MADDRIX and Alice Maddrix, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 85–3173.

United States Court of Appeals, Eleventh Circuit.

Jan. 22, 1986.

---

Elliot I. Miller, Pawling, N.Y., for petitioners-appellants.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Chief, Tax Div., David E. Carmack, Francis M. Allegra, Attys., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before RONEY and ANDERSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

ANDERSON, Circuit Judge:

James Maddrix and Alice Maddrix ("Taxpayer")[1] appeal from a decision of the Tax Court disallowing, *inter alia*, certain advanced minimum royalty deductions and determining a $74,069.51 deficiency in their 1977 joint federal income tax return. This case presents a question of first impression concerning the proper application of 26 C.F.R. § 1.612–3(b)(3) (1985), which governs the deductibility of advanced minimum royalties paid or accrued in connection with mineral deposits. We affirm.

## I. BACKGROUND

Taxpayer is the owner of an undivided working interest in a mineral investment program known as Investors Mining Program 77–2 ("Investors Mining"),[2] which was formed in September 1977 for the purpose of developing and mining coal reserves. In September 1977, Investors Mining entered into a coal sublease with Olentangy Resources, Inc. ("Olentangy"), which provided Investors Mining with the right to mine coal reserves on 236 acres of land in Logan County, West Virginia. The sublease was for a term of ten years or until the coal reserves were exhausted.

Under the terms of the sublease agreement ("Agreement"), Investors Mining agreed to pay Olentangy an "annual minimum royalty" of $300,000 to be paid on December 1 of each year. The Agreement also provided that upon commencement of the sublease, Investors Mining would pay Olentangy $2,540,000 of the "annual minimum royalty," with $590,000 to be paid in cash ("initial annual minimum royalty") and $1,950,000 to be paid by nonrecourse promissory notes bearing six percent annual interest and payable in quarterly install-

---

1. The disallowed deductions relate to the business activities of James Maddrix. His wife Alice Maddrix is a party to this litigation because she filed a joint federal income tax return with her husband.

2. Investors Mining Program 77–2 was one of five mineral investment programs known as Investors Mining Program 77–1 through 77–5. Investors Mining Program 77–2 was originally organized as a West Virginia partnership, but it elected under I.R.C. § 761(a)(2) to be excluded from the partnership provisions of subchapter K of the Internal Revenue Code ("Code").

ments from March 31, 1978 through June 30, 1985 ("subsequent annual minimum royalty payments").[3]

The Agreement also obligated Investors Mining to pay a tonnage royalty of $3 per ton of coal mined and removed from the property. Under the terms of the Agreement, Investors Mining could recoup the "initial annual minimum royalty" against the tonnage royalty at the rate of $3 per ton for 846,667 tons extracted. In addition, the "subsequent annual minimum royalty payments" could be recouped at the rate of $3 per ton at the time coal was extracted subsequent to the delivery of these payments. Finally, Olentangy's sole recourse for Investors Mining's default of any of its obligations under the sublease was to terminate the sublease and proceed against Investors Mining's interest in the sublease.[4]

Upon execution of the sublease in 1977, the Taxpayer contributed $31,230 cash and executed a $103,239 nonrecourse note as his pro rata share of the "annual minimum royalty." As specified in the Agreement,

the note provided for the payment of interest on the unpaid balance at the rate of 6% per annum and provided for quarterly installment payments. Any unpaid principal or interest would be fully due and payable on June 30, 1985, or the prior termination of the borrower's fractional undivided interest. Under the terms of the note, if the Taxpayer were to default on any payment on the note for a period of twenty-four months and this default was not remedied within three months after the receipt of written notice, or in the event of any other event of default under the sublease, Olentangy could declare the entire unpaid principal and any accrued and unpaid interest immediately due. The note, however, specifically provided that the Taxpayer would not be personally liable for any amounts payable under the note, and that the note was secured solely by Taxpayer's interest in the sublease.

Simultaneously, with the execution of the sublease, Investors Mining entered into a mining services contract ("Contract") with Big Sandy Creek Mining Co., Inc. ("Big

---

**3.** The Agreement provides in relevant part:

> 5. *Annual Minimum Royalty.* Sub-Lessees covenant and agree to pay to Sub-Lessor, during the term of this Sub-Lease, an annual minimum royalty for all coal extracted under the Master Lease in the amount of Three Hundred Thousand Dollars ($300,000) which shall be paid on December 1 for each year for the Lease Year which commences on that date ...; provided, however, upon commencement of this Sub-Lease, the Sub-Lessees shall pay to the Sub-Lessor the sum of Two Million Five Hundred and Forty Thousand Dollars ($2,540,000) of which Five Hundred Ninety Thousand Dollars ($590,000) will be in cash and One Million Nine Hundred and Fifty Thousand Dollars ($1,950,000) will be represented by the execution and delivery to the Sub-Lessor of non-negotiable, non-recourse promissory notes, payable to the Sub-Lessor in the original aggregate principal amount of One Million Nine Hundred and Fifty Thousand Dollars ($1,950,000), and bearing interest at six percent (6%) per annum payable in quarterly installments of $81,196 beginning March 31, 1978, and ending June 30, 1985. These payments shall hereinafter be referred to as "SUBSEQUENT ANNUAL MINIMUM ROYALTY PAYMENTS." The Five Hundred Ninety Thousand Dollars ($590,000) payment

shall be referred to hereinafter as the "INITIAL ANNUAL MINIMUM ROYALTY."

**4.** The limitation of liability clause provides as follows:

> Neither Sub-Lessor nor Sub-Lessees nor the respective nominees, successors, assigns, employees, agents or any person or entity controlled by them or with which they are affiliated shall initiate, seek, pursue or participate in any action, legal or equitable, including but not limited to any attempt to obtain money, damage or deficiency judgments, against any of Sub-Lessees or Sub-Lessor, as the case may be, their respective heirs, executors, administrators, successors or assigns, in their capacity as Sub-Lessees or Sub-Lessor on account of any obligation of Sub-Lessees or Sub-Lessor under this Sub-Lease, it being agreed that (i) with respect to Sub-Lessees, only their interest in this Sub-Lease shall be subject to execution, attachment or any other claim or proceeding on account of any obligation of Sub-lessees hereunder and (ii) with respect to Sub-Lessor, only the interest of Sub-Lessor under the Lease, including, without limitation, its interest in the Notes, shall be subject to execution, attachment or any other claim or proceeding on account of any obligation of Sub-Lessor hereunder.

Sandy Creek"), an affiliate of Olentangy.[5] The Contract would remain in force, unless otherwise terminated by the parties, for an initial period of eight years, and after the expiration of that period, Big Sandy Creek had the option to renew for three additional periods of five years each or until all the coal had been mined from the property.

Under the provisions of the Contract, Big Sandy Creek agreed to mine no less than 100,000 tons of coal during each contract year. The Contract also contained a liquidated damages clause:

> It is understood that in the event that [Big Sandy Creek] shall default in the performance of minimum delivery obligations herto, damages would be difficult to determine. Accordingly, [Big Sandy Creek] agrees that [in the event of] its failure to deliver the minimum tonnage set forth above in any year, it shall promptly pay to [Investors Mining] liquidated damages in an amount equal to $3.00 per ton multiplied by the difference between the minimum deliveries required for such year and the actual delivery made in such year (the "Deficiency"), which sum shall be applied toward the principal and interest payments due by the Co-owners of [Investors Mining] on the Notes issued by [them] pursuant to the lease with Olentangy Resources, Inc. (the "Notes").
>
> In order to secure the payment of the Deficiency, [Big Sandy Creek] agrees to loan to each Co-owner funds sufficient to make all required principal and interest payments under such Co-owners' Notes. In lieu of advancing cash, [Big Sandy

Creek] may issue its own promissory notes to [Olentangy] under the lease provided that [Olentangy] accepts the same on a dollar-for-dollar basis as being equivalent to a cash payment under the Notes.

Record on Appeal, Doc. 9, Exh. E at 7. The Contract was subsequently modified to give Big Sandy Creek the option, in its sole discretion, to pay these liquidated damages either in cash or in notes payable to Olentangy. Olentangy also agreed to accept from the co-owners of Investors Mining, without recourse, any notes received by them from Big Sandy Creek and to apply these notes as credits against their obligations to pay their nonrecourse notes to Olentangy.[6]

The Taxpayer elected to be taxed on the accrual method of accounting with respect to his proportionate share of the income, gain, loss, deductions and credits arising from his investment in Investors Mining. During 1977, no coal was mined on behalf of Investors Mining, and Taxpayer filed a joint federal income tax return for 1977, claiming a business loss of $142,387 arising from his participation in Investors Mining. This loss was comprised of "advance mining royalties" expenses of $134,471[7] and miscellaneous fees and interest of $7,916. The Commissioner of Internal Revenue disallowed the deductions in their entirety.

Taxpayer filed a petition in the United States Tax Court seeking a redetermination of the deficiency asserted by the Commissioner, and the Commissioner moved for partial summary judgment on the issue of the deductibility of the advanced minimum

---

**5.** The same four individuals owned both Big Sandy Creek and Olentangy.

**6.** This modification to the Contract provides as follows:

> Any payments which may be required to be made by [Big Sandy Creek] under this Agreement to [Investors Mining] may be made at the sole election and discretion of [Big Sandy Creek] either in cash or in non-interest bearing, negotiable, promissory notes, payable to [Olentangy]. By execution of this Agreement, [Olentangy] agrees to accept from [Investors Mining], without recourse, any promissory notes received by [Investors Mining] from

> [Big Sandy Creek] pursuant to this agreement and [Olentangy] shall apply such promissory notes as credits against [Investors Mining's] obligations to pay the Subsequent Minimum Annual Royalty payments as required by the Sub-Lease.

**7.** The Tax Court noted that there is a $2 discrepancy between the amount of "advanced mining royalties" allegedly paid ($31,230 in cash and $103,239 by the nonrecourse note) and the $134,471 amount claimed on the return. *Maddrix v. Commissioner*, 83 T.C. 613, 618 n. 5 (1984).

annual royalty. The Tax Court entered judgment for the Commissioner, holding that Taxpayer had not met the requirements of 26 C.F.R. § 1.612–3(b)(3) because Taxpayer's "execution of a nonrecourse note, payments on which were contingent on coal sales proceeds, does not establish an enforceable *requirement* that substantially uniform minimum royalties be paid annually in any event, regardless of annual production." *Maddrix v. Commissioner*, 83 T.C. 613, 623 (1984) (emphasis in original). The Tax Court also rejected Taxpayer's contention that a liquidated damages clause in the mining services contract eliminated the contingent nature of the note, reasoning that this clause did not create an enforceable requirement for substantially uniform payments of minimum royalties. *Id.* at 623–26. The Tax Court denied Taxpayer's motion for reconsideration, and this appeal ensued.[8]

## II. DISCUSSION

On appeal, Taxpayer contends that Treasury Regulation 1.612–3(b)(3)'s requirement of annual payment of substantially uniform royalties has been satisfied in the instant case because the liquidated damages clause in the mining services contract requires Olentangy to credit to Taxpayer's advanced minimum annual royalty obligation the amount of Big Sandy Creek's promissory notes, regardless of whether the notes from Big Sandy Creek to Olentangy are ever actually paid. We disagree.

Under Treas.Reg. 1.612–3(b)(3), advanced minimum royalties are generally deductible only in the year the mineral product to which they relate is sold. 26 C.F.R. § 1.612–3(b)(3) (1985). This regulation, however, does allow a current deduction for advanced royalties when they are paid or accrued "as a result of a minimum royalty provision." *Id.* In order to fall within this exception, the minimum royalty provision must "require[] that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least twenty years, in the absence of mineral production requiring payments of aggregate royalties in greater amounts." *Id.*

▮ An examination of the relevant documents in this case establishes that there is no requirement for the annual and uniform payment of advanced minimum royalties.[9] The sublease and the nonrecourse notes executed by Taxpayer pursuant to its terms do not contain such a requirement. Since the notes issued by the Taxpayer were nonrecourse and secured only by the mineral interest itself, Olentangy could only look to the Taxpayer's interest in the minerals themselves for payment of Taxpayer's obligation. In *Wing v. Commissioner*, 81 T.C. 17, 38–42 (1983), the Tax Court expressly held that such an arrangement did not meet the terms of § 1.612–3(b)(3) because it did not *require* annual and uniform payments. In similar circumstances, courts have consistently rejected tax deductions based on nonrecourse notes contingent upon the production of minerals. *See, e.g., CRC Corp. v. Commissioner*, 693 F.2d 281, 283–84 (3d Cir.1982) (nonrecourse debt contingent upon production of oil or gas did not qualify as deduction under I.R.C. § 636), *cert. denied*, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983); *Brountas v. Commissioner*, 692 F.2d 152, 158–61 (1st Cir.1982) (same), *cert. denied*, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983); *Gibson Products Co. v. Unit-*

8. The Tax Court did not consider whether Taxpayer's deduction of $7,916 for miscellaneous fees and interest was proper, and Taxpayer does not raise the propriety of this deduction on appeal. Accordingly, we express no opinion on the issue of whether Taxpayer is entitled to deduct this amount.

9. The government contends that under Treas. Reg. 1.612–3(b)(3), the requirement for uniform annual payments of minimum royalties must be contained in the *sublease*. In *Wing v. Commis-*

*sioner*, 81 T.C. 17, 39 (1983), however, the Tax Court considered "the agreement *as a whole*, along with any pertinent additional information, to determine if the requirements for establishing a minimum royalty provision have been met." Because consideration of all the relevant documents in this case shows that there is no requirement for annual uniform payments, we do not reach the question of whether such a requirement must be contained in the sublease alone.

*ed States,* 637 F.2d 1041, 1049–52 (5th Cir. Unit A Feb. 23, 1981) (same).[10] We conclude that nonrecourse notes secured only by the taxpayer's mineral interest do not fulfill the requirements of § 1.612–3(b)(3).

■ Taxpayer argues that the contingent nature of the nonrecourse note is cured by the provision in the mining services contract requiring Big Sandy Creek to pay liquidated damages in an amount sufficient to amortize his obligation under the nonrecourse note. Under the terms of the mining services contract and its modification, Big Sandy Creek had the sole discretion to pay the liquidated damages either in cash or in notes payable to Olentangy. In turn, Olentangy agreed to accept from Investors Mining, without recourse, the Big Sandy Creek notes and to apply such notes as credits against its obligation to pay the purported minimum royalties. Taxpayer did not argue in the Tax Court, and does not argue on appeal, that Big Sandy Creek's notes would have a fair market value[11] sufficient to satisfy the $1,950,000 obligation for subsequent annual minimum royalty. Taxpayer argues only that the

above described circular arrangement—Olentangy agrees to accept the notes of its affiliate, Big Sandy Creek, and credit same in full satisfaction of Investors Mining's annual minimum royalty obligation to Olentangy—should be deemed the equivalent of an enforceable requirement to pay such annual minimum royalties. We agree with the Tax Court that this arrangement is illusory and cannot constitute the annual and uniform payment of minimum royalties contemplated by Reg. § 1.612–3(b)(3).[12]

Since the royalties "paid" by Taxpayer in 1977 were not paid "as a result of a minimum royalty provision," Taxpayer does not fall within the exception to the general rule that advanced minimum royalties are deductible only in the year the mineral product to which they relate is sold. Because no coal was sold in 1977, Taxpayer was not entitled to a deduction in 1977 for advanced minimum royalties.[13]

## III. CONCLUSION

For the foregoing reasons, the judgment of the Tax Court is therefore

AFFIRMED.

10. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

11. Evidence in the record indicates that Big Sandy Creek is a newly formed corporation with limited financial resources, Record on Appeal, Doc. 9, Exh. E at 16, 23, 30, and the private placement memorandum repeatedly warned that there was no assurance Big Sandy Creek would be financially responsible with respect to its obligations, *id.* at 16, 19, 23. Thus, the undisputed facts probably establish that Big Sandy Creek's notes would not have a fair market value sufficient to satisfy the $1,950,000 obligation. In any event, although this case comes to us in a summary judgment posture, Taxpayer did not argue in the Tax Court, and does not argue on appeal, that there are genuine issues of fact. Indeed, Taxpayer's argument has been that it is irrelevant whether or not Big Sandy Creek ever pays; Taxpayer's sole argument has been that the circular arrangement described in the text should be deemed the equivalent of the required payment.

12. Simplified, Taxpayer's argument is as follows: if lessee agrees to pay lessor $100,000 per year as annual minimum royalty payments, and

lessor agrees to accept a peppercorn each year in full satisfaction thereof, Taxpayer argues that the arrangement is the equivalent of an enforceable requirement to pay a $100,000 annual minimum royalty. Thus simplified it is apparent that Taxpayer's argument is without merit.

13. Taxpayer also contends that since the annual amortization of his deferred royalty obligation is deemed a "payment" for determining taxable income under I.R.C. § 61(a)(12), it should also be considered a "payment" under 26 C.F.R. § 1.612–3(b)(3) (1985). *See* Appellant's Brief at 33–36. As the government noted in its brief (Appellee's Brief at 20–21 n. 19) and at oral argument, however, Taxpayer's 1977 tax return and the Commissioner's notice of deficiency do not indicate that the liquidated damages were ever taken into account as income. Moreover, Taxpayer's tax returns for other years are not in the record, and since he has kept his returns for those years open, he is not precluded from arguing that the liquidated damages should not be considered as income. Since the record does not suggest that the Commissioner is attempting to treat the liquidated damages as a "payment" for the purpose of generating taxable income, but not for the purposes of § 1.612–3(b)(3), we do not reach taxpayer's contention.