**Jack BROWN and Clara Brown, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 912, Docket 85–4189.**

United States Court of Appeals, Second Circuit.

Argued March 12, 1986.

Decided Aug. 28, 1986.

---

Remo Tinti, New York City, for petitioners.

Afrancis M. Allegra, Tax Div., Dept. of Justice, Washington, D.C., (Roger M. Olson, Acting Asst. Atty. Gen., Michael L. Paup, David English Carmack, Attys., Tax Div. Dept. of Justice, Washington, D.C., of counsel), for respondent.

Before KEARSE, CARDAMONE and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal is from a November 29, 1985 order of the United States Tax Court (Wright, J.) which granted summary judgment to the appellee, Commissioner of Internal Revenue, and held that appellants had improperly deducted $120,000 for a claimed advanced minimum royalty payment. As the poet Robert Burns so wisely observed: "The best-laid schemes o' mice and men, Gang aft a-gley...." Burns, *Verses to a Mouse*, in Vol. I The Poetical Works of Robert Burns 118 (Little Brown & Co. 1863). Here taxpayers' devised a complex income tax shelter scheme that was disallowed by the Internal Revenue Service and disapproved by the tax court because its substance was illusory. We affirm in substantial part for the reasons set forth by the tax court.

On April 27, 1978 appellants Jack and Clara Brown entered into a series of three interrelated contracts with Weston Petroleum, Inc. (Weston). The first was entitled a "Sublease Agreement", under which the Browns obtained the exclusive right from Weston to mine coal on a specified tract. In return, the Browns agreed to pay Weston a minimum annual royalty of $120,000 due irrespective of whether or not any coal was mined. For the 1978 tax year, an advance royalty payment was claimed, structured as a $30,000 cash payment and a $90,000 nonrecourse promissory note. Under the note's terms, the Browns were obligated to pay Weston $9,000 per year for ten years plus interest which accrued at 6% per annum. Weston's only remedy in the event of default was to proceed against the collateral securing the note, which consisted solely of appellants' interest in the mining venture.

The second instrument, called a "Mining Services Agreement", authorized Weston to mine the coal on the property that was the subject of the recited sublease. Weston was obligated to mine 27,667 tons of coal annually; if it failed to do so, a liquidated damage clause stated that it would reimburse appellants at a rate of $8.25 per ton for each ton below 15,000 mined. Therefore, if no coal was mined, Weston would owe appellants $123,750 in liquidated damages. This sum exactly corresponds to the $120,000 minimum royalty payment plus the annual income owed on the appellants' note.

Finally, Weston and the appellants signed a third agreement, a "Coal Brokerage Agreement", under which Weston undertook to market the coal. Proceeds from the coal sales could be applied by Weston to the remaining balance of the $90,000 note. In short, in accordance with the ser-

ies of agreements entered into on April 27, 1978, Weston subleased coal-rich property to the Browns who then granted Weston rights to mine and market the coal.

On their 1978 tax return, appellants claimed a deduction of $120,000 for the advance royalty payment which the Commissioner of Internal Revenue disallowed. Generally, advanced royalties are deductible only for the year that the mineral, with respect to which the advanced royalties were paid, is sold.[1] 26 C.F.R. § 1.612–3(b)(3) (1985). An exception is recognized under the regulation in the case of advanced royalties paid or accrued "as a result of a minimum royalty provision." *Id.* Advanced minimum royalties may, at the payor's option, be deducted in the year that they are paid or accrued, so long as the payment is "require[d]." *Id.*

When the matter was brought before it, the tax court properly found this deduction impermissible because the royalty payment was not required. The nonrecourse nature of the loan, the complete "wash" between the royalty payment and the liquidated damages clause, and the limitation of appellants' liability solely to their interest as defined in the sublease agreement conclusively demonstrated that the royalty payments were not required. *See Ward v. Commissioner,* 784 F.2d 1424, 1426–29 (9th Cir.1986); *Maddrix v. Commissioner,* 780 F.2d 946, 950–51 (11th Cir.1986); *Oneal v. Commissioner,* 84 T.C. 1235, 1238–44 (1985); *Vastola v. Commissioner,* 84 T.C. 969, 972–79 (1985); *Wing v. Commissioner,* 81 T.C. 17, 38–42 (1983).

On appeal, appellants argue that the tax court applied an improper summary judgment standard. Specifically, they challenge its conclusion that nonrecourse notes could be used in future years to pay the annual minimum royalty. The proper standard is one in which the tax court "view[s] the facts and inferences to be drawn therefrom in the light most favorable to the party opposing the motion for summary judgment...." *Vastola,* 84 T.C. at 970 n. 2, citing *Wright v. Commissioner,* 84 T.C. 636, 638 (1985).

Appellants correctly note that the sublease agreement is silent as to the structure of the royalty payments other than for the advanced royalty. Given this, while the silence could reasonably be interpreted as condoning the use of nonrecourse loans in future years, such an inference runs counter to the above standard. It is harmless error, however. First, taxpayers' challenge relates to post-1978 annual royalty payments, while at issue in this case is the propriety of the advance royalty payment deduction claimed in 1978. The tax court's findings as to possible future payments only tangentially touch that issue. Second, the form of future payment is irrelevant because the transaction was structured so that the annual royalty payment was cancelled by the liquidated damage payment. For example, in 1979, no coal was mined. Appellants owed a royalty payment of $120,000 while Weston was required to pay $123,750 in liquidated damages. Weston therefore owed appellants a further $3,750 which was paid on December 24. On December 26, appellants sent a check for

---

1. Section 1.612–3(b)(3) provides in pertinent part:
   (3) The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. For purposes of the preceding sentence, in the case of mineral ·sold before production the mineral product is considered to be sold when the mineral is produced (i.e., when a mineral product first exists). However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum

royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. See section 446 (relating to general rule for methods of accounting) and the regulations thereunder. For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount.

$3,750 representing "interest" to Weston thereby discharging their royalty obligations and making the entire transaction ephemeral. In view of the nature of the transaction, the form of the $120,000 transfer amounts to no more than mutual bookkeeping entries that cancelled out each party's obligations under the agreements.

Appellants further argue that they fall within footnote 33 of *Wing*, 81 T.C. at 41. On the facts of that case, the tax court stated that if a minimum payment on a note is required with the penalty for nonpayment being the loss of the mineral reserves securing the lease, then these annual payments could be considered required, consistent with Treas.Reg. 1.612–3(b)(3). Appellants would therefore have to show that the sublease mandates that they pay $9,000 yearly or risk having that agreement revoked. Relying on the nonrecourse nature of the notes, the tax court concluded that the $9,000 annual payments were not required. We agree that the payments were not required, but reach that result by somewhat different reasoning.

In our view the tax court failed to apply separately the provisions of footnote 33 in *Wing*. Instead, it examined whether the note was nonrecourse with liability limited to the mineral resource securing the note. Finding that to be the fact, the periodic payments pursuant to it were not considered required. *See also Maddrix*, 780 F.2d at 950–51 (In a case where quarterly payments were involved, but as far as we can determine the footnote 33 argument was apparently neither directly raised nor addressed, the court did offer the following sweeping statement: "We conclude that non-recourse notes secured only by the taxpayer's mineral interest do not fulfill the requirements of § 1.612–3(b)(3).").

Yet, an analysis which focuses solely on the nature of the note and the security that guarantees its payment without examining more does not appear consistent with footnote 33. It is not enough simply to say that because the note is nonrecourse, any yearly payment is not required. Rather, the inquiry in this limited area should be whether the failure to make a specified annual payment can result in the loss of all lease rights within the one-year period. For example, consider the court's further analysis in *Wing*.

We note that petitioner's structuring of payments followed by the giving of the note is a further indication that there is no requirement to pay a substantially uniform amount at least annually. See note 33 *supra*. *We can discern no reason for petitioner's stating that $6,000 is to be paid each year for the life of the lease and then give a note due in the 10th year for those same amounts other than that petitioner did not want to be liable for payment during the term of the lease. Without such liability, there can be no enforceable requirement to pay, and hence, no minimum royalty provision.*

81 T.C. at 41 n. 35.

We set forth our reasons for thinking that appellants' yearly payment of $9,000 was not required. The Browns only risk losing their coal interest if through their actions they create an "event of default." As set forth in the sublease agreement, they can do this in two different ways: First, appellants could have created "an event of default" if a royalty payment or other monetary obligation is in arrears and not paid during the 30 days following the receipt of proper notice. In 1978 there was no default created in this manner as the royalty payment was made—in part through the execution of a promissory note. Second, "an event of default" can arise from a prolonged default on the note. Consistent with the sublease agreement this situation does not arise until a payment is not made for two years, and then only after an additional three month grace period—to run from the receipt of proper notice—has elapsed. The $9,000, being a partial payment of the debt embodied in the note, falls into this latter category. It is not a royalty payment like the note itself. Instead, it is an installment payment which the parties have chosen to treat differently under the default provisions. Therefore, if

appellants fail to pay the $9,000 in any one year, they do not risk losing their mineral rights because there is no event of default unless payment is delayed more than two years. In fact, there is no unavoidable possibility of the loss of mineral rights. Even if an event of default was declared, whether a loss would result rested entirely within Weston's discretion. As noted in *Wing*, 81 T.C. at 40–41, possibilities of payment are insufficient to satisfy Treas.Reg. 1.612–3(b)(3). Similarly, a possibility of the loss of mineral reserves is insufficient to satisfy the "required" payment provision of the Treasury Regulation and the standard set out in footnote 33. Finally, underscoring appellants' ability to avoid payment without endangering their mineral rights is the fact that the $9,000 was never actually paid.

Accordingly, the order of the tax court is affirmed.

KEARSE, Circuit Judge, concurring:

I concur in the judgment and would affirm substantially for the reasons stated in the opinion of the Tax Court, 50 T.C.M. (CCH) 1418 (1985).