GEORGE A. TOMASSO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tomasso v. Commissioner
Docket No. 26320-89
United States Tax Court
T.C. Memo 1991-173; 1991 Tax Ct. Memo LEXIS 194; 61 T.C.M. (CCH) 2416; T.C.M. (RIA) 91173; April 16, 1991, Filed *194 Respondent's motion for partial summary judgment will be granted. Kenneth E. Werner and Thomas R. Webb, for the petitioner. John D. Steele, Jr., for the respondent. PANUTHOS, Special Trial Judge. PANUTHOS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency for the taxable year 1978 in the amount of $ 135,470.10. Respondent further determined that increased interest was due under section 6621(c)[1] (formerly section 6621(d)) for a substantial understatement attributable to a tax-motivated transaction. A timely petition was filed. This case is before the Court on respondent's motion for partial summary judgment. The issue for decision is whether respondent is entitled to summary adjudication on petitioner's claimed deduction for advanced minimum royalty payments. FINDING OF FACTS At *195 the time he filed his petition herein, petitioner resided at Boca Raton, Florida. Petitioner was a limited partner in the partnership known as West Liberty Coal Program (hereinafter Liberty) in 1978. In September 1978, J.E. Bench Coal Enterprises (hereinafter J.E. Bench) entered into lease agreements as lessee with certain named lessors. Under the terms of the lease agreements, J.E. Bench obtained the right to mine coal in the Millers Creek seam underlying certain tracts of land in Morgan County, Kentucky. The lease agreement provided that the lessee was required to pay a specified amount of money as rent and royalty for coal mined. The lessee also agreed to pay an advanced royalty fee. J.E. Bench assigned its interests in the leases to Amity Financial (hereinafter Amity) by agreement dated September 22, 1978. No advanced royalty was specified in the agreement. Amity entered into a sublease dated November 10, 1978, with Beta Lighting Systems, Inc. (Beta) doing business as Liberty. Liberty was the operating manager under a joint operating agreement entered into on November 10, 1978, with Amity. Petitioner was a named participant and co-owner in the joint operating agreement. *196 The sublease agreement provided in part as follows: SECTION 5: ROYALTIES -- Lessee [Liberty] shall pay to Lessor [Amity] for the right and privilege of mining the Millers Creek seam of coal on the premises of the Prime Lease ("Millers Creek Coal"), a royalty of $ 7.50 per ton plus 15% of the selling price per ton of coal mined and sold in excess of $ 25.00. Such royalty shall be due and payable on or before the fifteenth day of each month during the terms of this Lease for coal mined and removed during the preceding calendar month. During each calendar year and as a condition to Lessee's continued use and possession of the leased coal, Lessee shall mine and pay royalties with respect to 265,000 tons of 2,000 pounds of Millers Creek seam of Coal mined and sold (the "Guaranteed Minimum Annual Royalty") and in the event that Lessee shall fail to mine and pay royalties with respect to such numbers of tons by the end of December of any calendar year, Lessee shall pay on the thirty-first day of December the difference between the royalties paid for production during such year and the Guaranteed Minimum Annual Royalty. Such payments made with respect to the Millers Creek Coal *197 on the thirty-first day of December of any year shall be credited at the rate of $ 2.426769 per ton of Millers Creek Coal mined in any subsequent year with respect to tons of Millers Creek Coal mined in such subsequent year in excess of 287,520 tons. Upon termination of this Lease for any reason including nonpayment of Guaranteed Minimum Annual Royalty, no portion of any previously paid Guaranteed Minimum Annual Royalty shall be refunded whether or not full credit has been given or made available as provided above. For the purpose of the preceding, a calendar year is a period ending on December 31 of a particular year and commencing on or after January 1 of the same year. It is further agreed that upon the execution of this Lease, Lessee shall pay lessor $ 1,987,500 in respect of the Guaranteed Minimum Annual Royalty for the calendar year 1978 due on December 31, 1978 as follows: (a) Cash in the amount of $ 381,195; and (b) Delivery of a non-recourse note or notes in form attached hereto as Schedule 'B' in the total principal sum of $ 1,606,305.00. With respect to said Note, the following conditions and terms shall be incorporated therein: and 1. Payment -- Principal *198 and interest shall accrue and be paid as follows: (i) Commencing on the date of execution, interest shall accrue under the Note at the rate of 10% per annum on the outstanding principal balance at the commencement of each month. (ii) During the period commencing on the above date through December 31, 1989, principal and interest on the Note shall be prepaid in eleven (11) equal consecutive annual installments of no less than $ 100,000.00, said payments to commence on December 31, 1979 and to continue on the last day of December in each year thereafter through December 31, 1989, unless sooner paid in full. On December 31, 1990, the balance of the Note plus all accrued interest shall become due and payable in full. (iii) All payments made on account of the Note as described in Paragraph 1(ii) above shall be applied first to payment of interest due, and then to payment of principal until all $ 1,606,305.00 of such principal (plus the Notes delivered under Section 5(c) above) has been paid. (iv) Interest for the first six (6) months shall be accumulated and paid ratably over the remaining term of the Note. (v) If at the time the principal amount of the Note is paid in *199 full there shall be any interest accrued but unpaid, such interest shall be paid as provided above without interest until paid in full.
Paragraph numbered 3 of section 5 of the sublease provided as follows: 3. Default -- If at any time during the term of the Note there shall be due but unpaid an amount equal to one (1) annual payment required to be made pursuant to Paragraph 1 hereof (after giving effect to the aggregate number of payments made pursuant to Paragraph 2 hereof and after crediting, as if it were a prepayment, the cash portion of its Minimum Annual Royalty paid to the Payee in accordance with the Sublease, a sum equal to $ 381,195.00 and such amount) shall not be paid in full within thirty (30) days after written notice thereof by Payor, Payee may, at its option, declare the then unpaid principal and interest under the Note due and payable and forthwith terminate the Sublease with respect to the defaulting Payor; provided, however, that such failure to meet the terms of this non-recourse promissory note, on the part of the Payor, is not by reason of any unforeseeable cause beyond the control of and not resulting from the fault or negligence of the Payor, such *200 as Acts of God, acts of the public enemy, insurrections, riots, labor disputes, labor or material shortages, fires, explosives, floods, breakdowns of or damage to plants, equipment or facilities, interruptions to transportation, shortages of railroad cars, embargoes, orders or acts of civil or military authority or any other cause of similar nature (any such cause being herein referred to as "force majeure") which wholly or partly prevents the mining and delivering of coal by Payor, or that renders the Payor unable to carry out its obligations under this Non-Recourse Promissory Note, then if the Payor gives to the Payee ten (10) days written notice of the extent and probable duration of such force majeure, the obligation of the Payor shall be suspended to the extent made necessary by such force majeure and during its continuation; provided, however, that the cause of such force majeure is eliminated insofar as possible with all reasonable dispatch. In any year subsequent to 1978 in which the Lessee fails to mine the Guaranteed Minimum Royalty and provided that Lessee is not otherwise in default under this Lease or any obligation created hereunder, Lessee may satisfy its obligation *201 for the portion, if any, of the Guaranteed Minimum Annual Royalty due on December 31, of such year by delivery to Lessor of a non-recourse note(s) (the "Additional Note(s)") in an amount not to exceed $ 1,606,305.00, equal to the Royalties due respectively on the differences between the number of tons of Millers Creek Coal mined and paid for during such year and 265,000 tons. The Additional Note(s) shall be substantially identical to the note described in Schedule 'B' except that the term of any Additional Note(s) shall not exceed the lesser of six (6) years or the remaining term of this Lease (without regard to extensions). If more than 30% of the face amount of any note delivered by the Operating Manager after 1978 on behalf of the entire Program shall be in default, or if more than 30% of the face amount of any notes delivered by the Participant in accordance with the provisions of this Sublease shall be in default, then and in that event this Sublease shall be deemed to be in default and the Lessor may take the appropriate legal steps to foreclose and recapture the Lessee's interest herein.
Petitioner executed and delivered a nonrecourse note in favor of Amity in the *202 amount of $ 242,463.26. [2] The note provided as follows: FOR VALUE RECEIVED, the undersigned, Participant ("Payor") of WEST LIBERTY COAL PROGRAM (the "Program") promises to pay AMITY FINANCIAL, a Connecticut limited partnership ("Payee"), the principal sum of $ 242,463.26 together with interest thereon at the rate of 10% per annum.
This Note is issued by Payor pursuant and subject to a Sublease dated the date hereof (the "Sublease") between Payor and Payee under which the Payor has acquired certain mineral rights relating to the tract of land described therein (the "Subleased Property"). The Sublease contains and sets forth the terms and conditions under which this Note is to be paid and prepaid *203 as well as events of default under this Note. Such terms and conditions and events of default are incorporated herein by this reference. NON-RECOURSE NATURE OF NOTE -- Payment of this Note is wholly without recourse to the Payor and Payee's sole remedy upon the occurrence of such non-payment shall be to terminate the Sublease. IN WITNESS WHEREOF, the undersigned Participant has executed this Non-Recourse Promissory Note the 30th day of October 1978.
No coal was mined and no sales of coal occurred in 1978. Petitioner and other partners of Liberty elected not to be taxed as a partnership under section 761(a). Petitioner also elected to use the accrual method of accounting for reporting income and losses from Liberty. Liberty reported a loss for 1978 in the amount of $ 2,012,201 of which $ 1,987,500 represents an advanced minimum royalty. On Schedule C of his 1978 Federal income tax return, petitioner reported a loss $ 303,691 which included a deduction for an advanced minimum royalty in the amount of $ 297,000. In the notice of deficiency, respondent disallowed the claimed loss on a number of grounds, including the determination that the amount claimed as an advanced minimum *204 royalty did not qualify as such under the Internal Revenue Code. OPINION Rule 121(b) provides that a decision may be rendered upon Motion for Summary Judgment if it is shown "that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." The Rule further provides that "partial summary adjudication may be made which does not dispose of all the issues in the case." The factual materials presented and the inferences to be drawn from such materials "must be viewed in the light most favorable to the party opposing the motion." Jacklin v. Commissioner, 79 T.C. 340, 344 (1982); Naftel v. Commissioner, 85 T.C. 527 (1985). The rules for deductibility of advanced royalties are contained in section 1.612-3(b)(3), Income Tax Regs. The general rule is that advanced royalties are deductible only in the year that the mineral product is sold. However, a current deduction is allowed in the case of advanced royalties paid or accrued "as a result of a minimum royalty provision." It is this language on which petitioner relied in claiming his deduction for 1978. The regulations further state that: a minimum *205 royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. [Sec. 1.162-3(b)(3), Income Tax Regs.; Emphasis added.]
Petitioner argues that the sublease required a substantially uniform annual payment of royalties. He argues that the nonrecourse note was not contingent on coal production, thus cases cited by respondent on this point are inapplicable. He further seeks to distinguish this case with respect to the default provisions. He argues that nonpayment of a guaranteed annual minimum royalty payment could trigger a default. Thus, Amity could terminate the sublease if royalty payments were not made. As an alternative position, petitioner argues that there is a factual dispute relating to the value of petitioner's rights under the lease; thus, the case is not ripe for summary judgment. Respondent relies on a number of cases where courts have held that a nonrecourse note and sublease agreement did not require a uniform annual payment of royalties. Maddrix v. Commissioner, 83 T.C. 613, 621 (1984), *206 affd. 780 F.2d 946 (11th Cir. 1986); Wing v. Commissioner, 81 T.C. 17 (1983); Vastola v. Commissioner, 84 T.C. 969 (1985); Goldstone v. Commissioner, T.C. Memo 1986-481. We must decide whether petitioner was required to pay royalties of a substantially uniform amount annually over the life of the sublease. In making this decision, we view this arrangement as a whole. Maddrix v. Commissioner, 83 T.C. at 621. After a review of the promissory note and the sublease agreement, we conclude that the facts here are sufficiently similar to those in Maddrix to require the same result. Like Maddrix, no coal was mined in the year in issue and like Maddrix, the note was nonrecourse. By the terms of the sublease, subsequent payments could be made by issuance of additional nonrecourse notes. The Court of Appeals for the Eleventh Circuit held in Maddrix that "nonrecourse notes secured only by the taxpayer's mineral interest do not fulfill the requirements of section 1.612-3(b)(3)." 780 F.2d at 951. A final decision in this case would be appealable to the Court of *207 Appeals for the Eleventh Circuit. Under Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 455 F.2d 985 (10th Cir. 1971), we will follow decisions of the circuit to which a case is appealable. Since Maddrix is an opinion of the Eleventh Circuit, we are bound by that holding. The parties also dispute the effect of the default provisions of the sublease. Petitioner contends that a default could occur in any year of the sublease; thus, the test in Brown v. Commissioner, 799 F.2d 27 (2d Cir. 1986), affg. a Memorandum Opinion of this Court, has been met. Respondent argues, however, that the failure of the lessee to make a specified annual payment would not result in a loss of all lease rights within the one-year period. In Brown, the court of appeals reviewed the default provisions and found that the taxpayers' only risk of losing their coal interest was if through their actions they created an "event of default". The court in Brown held that there was no default in the year in issue (1978) since payment was made by a promissory note. The court than looked to determine if an "event of default" could arise from a *208 prolonged default on the note. The court in Brown found that under the sublease agreement a default does not arise until a payment is not made for 2 years, and then only after an additional 3-month grace period (after proper notice). The default provisions in the sublease agreement here provide in part that if one annual payment is not paid within 30 days after written notice thereof by the "payor" (lessee), then the "payee" (lessor) may at its option declare the unpaid amounts due and payable and terminate the sublease. Payments were due under the sublease on December 31st of each year. A payment was made by a nonrecourse note in 1978. The next payment would be due on December 31, 1979. In order to satisfy his obligation under the sublease, petitioner could (1) make the required payment in cash or by additional promissory note, (2) give written notice of nonpayment, or (3) do nothing. As pointed out by respondent, a literal reading of the default provisions requires not only a failure to pay, but also notice of nonpayment by the lessee (the party obligated to make payments under the sublease) in order to have an "event of default". Respondent suggests that the sublease *209 agreement may contain a typographical error, the lessee could not be considered to be in default until the lessee gave notice of nonpayment, which he might never do despite the failure to make payments. Thus, if the language contained in the sublease is as intended by the parties, it would not appear that petitioner would be in default unless he unilaterally determined to be so. We note that petitioner did not respond to respondent's discussion as to whether the language in the sublease agreement involves a typographical error. Accordingly, we accept the language set forth in the sublease agreement as presented by the parties. We are thus satisfied that failure to make payment under the sublease agreement would not automatically trigger a default. Months or years could pass after the due date for payment until a default occurred. Accordingly, the sublease agreement does not require a "substantially uniform amount of royalties be paid at least annually". Since we find that the payment provisions do not satisfy section 1.612-3(b)(3), Income Tax Regs., as a matter of law, petitioner is not entitled to a deduction for advanced royalties. To reflect the foregoing, Respondent's *210 motion for partial summary judgment will be granted. Footnotes
1. All section references are to the Internal Revenue Code as amended and as in effect for the tax year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In his motion for partial summary judgment, respondent states that petitioner "allegedly" invested $ 75,000 cash in Liberty. Petitioner does not specifically admit or deny this statement in his responses to respondent's motion. We do not need to make a finding on this question in order to rule on respondent's motion.↩