## COMMISSIONER OF INTERNAL REVENUE
## v. JAMISON COAL & COKE CO.
### (four cases).
### Nos. 5047–5050.

Circuit Court of Appeals, Third Circuit.

Sept. 29, 1933.

J. Louis Monarch, of Washington, D. C., and G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and Andrew D. Sharpe, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and J. E. Marshall, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for petitioner.

Smith, Shaw, McClay & Seifert, of Pittsburgh, Pa. (W. A. Seifert and Frank C. Miller, both of Pittsburgh, Pa., of counsel), for Jamison Coal & Coke Co.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

There are four petitions here to review orders of the Board of Tax Appeals involving income and profits taxes for 1918 and 1920. 24 B. T. A. 554. Two petitions were filed by the Commissioner of Internal Revenue and two by the taxpayer, the Jamison Coal & Coke Company of Pennsylvania.

The issue in the several petitions is whether or not annual minimum royalty payments made by the taxpayer, the lessee, under two coal leases are capital or business expenses.

The first lease is called the Thaw lease. It is for a term of forty years from 1918, and provides for royalties at a certain rate per ton. From 1918 to 1954 royalties must be paid annually on a minimum of 250,000 tons of coal whether or not that amount is mined. For the remaining years of the lease, royalties are required on smaller quantities. By its terms the lease is to continue in force until all the coal is removed, if the initial term of forty years expires before the depletion of the mine. The lease further provides that, if the minimum production of 250,000 tons is not mined for any year, the difference between that and the quantity mined may be applied in any subsequent year when actual production exceeds the minimum tonnage required.

In 1918 and 1920 the taxpayer paid the minimum royalties on the basis of 250,000 tons as the Thaw lease provides, but it failed to mine that quantity of coal. In its income tax returns for the two years, the taxpayer deducted the amount of the royalties as an ordinary and necessary expense paid in carrying on business. The Commissioner determined that the taxpayer could only deduct the amount of the royalties which represented coal actually mined, and accordingly disallowed the part of the royalties representing unmined coal, which he regarded as rental in

advance. The Board of Tax Appeals determined that the Commissioner should have allowed the full annual payments as necessary operating expenses in the years involved. The Commissioner contends that the Board is in error.

The second lease is the Fuller lease. It is for a term of ten years, and, at the end of the period, the lands and coal remaining unmined are to be conveyed to the taxpayer for a sum to be computed according to the several provisions of the lease. The lease provides for an annual royalty which must exceed the amount represented by 250,000 tons for the first year of the lease and 450,000 each year thereafter. But, as in the Thaw lease, the taxpayer is entitled to a credit in any following year in which coal is mined in excess of the minimum quantity. Also any payments made during the term of the lease and exceeding the value of coal actually mined would be credited at the end of the term on the purchase price of the remaining coal lands.

In 1918 and 1920 the taxpayer did not remove coal equal to the minimum quantity, but did pay the minimum amount of royalties for each year. The taxpayer treated the full payments as an ordinary and necessary business expense. The Commissioner and the Board of Tax Appeals held that the excess of the minimum royalties over the value of the coal mined was a capital expenditure. The taxpayer asks that this determination be reversed.

It is obvious that the parties to the leases intended that all the coal lying in the two properties would be mined. Both leases provide in a different fashion for this, the one by a continuation of the lease, until all the coal would be removed, the other by a revaluation and sale of the coal remaining unmined at the end of the term. If no contingencies should arise, the taxpayer is assured eventually of recovering the difference between the coal mined and the minimum payment required in any one year. Both leases contain an ordinary recovery clause, but the Fuller lease also provides that any excess at the end of the term of the lease may be credited on the purchase price of coal lands.

The Board of Tax Appeals distinguished the leases because in its opinion the Fuller lease was a contract of sale and not a lease. Its distinction was based on the provision of the Fuller lease providing that any excess remaining at the end of the term of the lease could be applied to the purchase price of the unmined coal. So the Board held, on the authority of Jefferson Gas Coal Company v. Commissioner, 52 F.(2d) 120 (C. C. A. 3), that the difference between the minimum royalty and the value of the coal mined was a capital expense. We do not think that that provision of the Fuller lease is a reason for reaching opposite results in the two cases. The taxpayer's opportunity for recovery is the same, in the end, under both leases. In the Thaw lease, any credit is applied to the purchase price of the coal remaining at the end of the term.

In the Jefferson Gas Coal Company v. Commissioner, supra, the coal lease provided that the lessee should make ten annual payments in all, at a certain rate per ton on a minimum tonnage of the value of $31,000; that the lessee must pay the annual minimum royalty of $31,000 for ten years; that, if in any year he mined a quantity of coal in excess of the minimum tonnage, he must pay for the excess at a stipulated price per ton, and this excess payment would be credited on the total payments of $310,000; and that, when the last annual payment was made, the lessor would convey to the lessee the lands and underlying, unmined coal from the sum of $1. We held in that case that the "lease" was in fact a contract of sale, and the lessee had an equity in the unmined coal to the extent of credits to which it was entitled, and therefore the lessee could only deduct so much of the $31,000 as was represented by coal mined during the year.

As a matter of fact, there seems to be no better case than the Jefferson Gas Coal Company Case, supra, to illustrate the similarity of the Fuller and Thaw leases and the difference between them and the Jefferson lease. The Jefferson lease provides for ten equal installments to be paid annually, plus a certain rate per ton for any coal mined over a certain quantity, so that the lessor will be protected and paid as the coal is removed; on the other hand, if the minimum quantity of coal is not mined in any year, the value of the coal not mined would be credited against the yearly installments of $31,000. The lessee is required to pay $310,000 in ten years, regardless of the amount of coal it removes, and then it would receive a deed for the lands and underlying coal remaining. There is no question of recovery of excess payments; the lessee has an equity to the extent of the unmined coal.

■ But the same contingencies affect the taxpayer in both the Thaw and Fuller leases. It must pay the minimum royalty each year whether or not coal is mined, and, if an ex-

cess is mined, it still must pay at the same rate per ton for that; save that it can apply any credit from a former year for coal not mined to the excess. In the Thaw. lease, the term of the lease is continued until all the coal is exhausted; in the Fuller lease, the coal remaining at the end of the term was to be purchased by the taxpayer. In both cases the parties contemplated the exhaustion of the coal during the terms of the leases. The Jefferson lease assures recovery by crediting the value of coal under minimum tonnage on the fixed price of $310,000. In other words, the "lease" simply constitutes a variable form for payment of the purchase price in a sale; providing in effect that the parties should pay or be paid as the coal is mined until ten installments of $31,000 will have been paid. The difference in the Thaw and Fuller leases is marked. The taxpayer must pay a minimum royalty. The value of the coal actually mined, less the value of the tonnage of the coal which the minimum royalty represents, may, if conditions permit, be deducted in a succeeding year, if more than the minimum tonnage is mined. But if in any year the taxpayer recovers a larger quantity of coal than provided in the minimum tonnage, it simply pays a stated royalty per ton, and receives no credit as in the Jefferson lease, toward a fixed purchase price. In the leases involved here, the taxpayer must pay a minimum royalty each year plus so much per ton over the minimum tonnage. The Jefferson lease is a sale of coal for a fixed sum, a minimum installment of which must be paid annually and, if more than the minimum amount of coal is removed in any year, the lessee must pay for the excess as he obtains it and receive a credit upon the definite sum agreed upon as the purchase price. In that there is a marked dissimilarity from the two leases here, where the lessee is in part paying a fixed sum annually, regardless of the coal mined, and the recovery of any coal not mined being dependent entirely upon the removal of the coal at a later time. There lies the difference between the leases here and the lease of the Jefferson Gas Coal Company. The fact is that the latter is a sale, but those involved here are leases. The two leases should be construed to be of the same effect and unlike the "lease" in the Jefferson case.

The other question is not difficult to decide, in view of the recent decisions of the Supreme Court and the Circuit Court of Appeals for the Fourth Circuit. All the considerations that determine the question whether or not the value of the unmined. coal, which has been paid for under the minimum tonnage requirement of the leases, may be deducted as a business expense for the year involved, are disposed of in the able opinion in the case of Burnet v. Hutchinson Coal Company, 64 F.(2d) 275 (C. C. A. 4).

The court in that case, which involved a lease substantially like the Thaw lease, held that the annual minimum royalty should be deducted in its tax return as a business expense, regardless of the fact that the minimum tonnage of coal was not mined.

The Supreme Court has decided in several recent cases that the whole of the minimum royalty received by the lessor from the lessee under leases like the two involved here is taxable as income during the year involved and is not a return of capital. Burnet v. Harmel, 287 U. S. 103, 53 S. Ct. 74, 77 L. Ed. 199; Bankers' Pocahontas Coal Company v. Burnet, 287 U. S. 308, 53 S. Ct. 150, 77 L. Ed. 325; Strother v. Burnet, 287 U. S. 314, 53 S. Ct. 152, 77 L. Ed. 330.

In deciding the converse of the questions involved here, the Supreme Court considered the same factors on which the result in this case must be reached, and it follows that our conclusion must be that the minimum royalty payments are deductible as business expenses.

The federal income tax statutes contemplate taxation on an annual basis of accounting. The payments of minimum royalty are like annual rents. They are the consideration for the right which the lessee acquires to exploit the land for coal, and annual payments are retained, regardless of whether or not the lessee benefits by the recovery clauses. Title to the coal is a mere incident in the operations of mining. "Such operations with respect to a mine have been said to resemble a manufacturing business carried on by the use of the soil, to which the passing of title of the minerals is but an incident, rather than a sale of the land or of any interest in it or in its mineral content." Burnet v. Harmel, supra, 287 U. S. at page 107, 53 S. Ct. 74, 76, 77 L. Ed. 199. It requires time to remove coal from the ground, and so many conflicting contingencies intervene during the operation that it does not vaguely resemble the single transaction which we call a "sale."

"The contingencies that would defeat the recapture of any part of this excess payment are numerous. The lessee might make default in the terms of the lease, in which event the lessor could repossess the property and the taxpayer would lose the payment; conditions surrounding the coal industry might be·

come such that the coal could not be sold for a price equal to the cost of production and the lease would necessarily have to be surrendered; the coal vein might 'pinch out'; fire might destroy the mine; labor troubles might prevent operation for a long period of time. In the event of the happening of any of these and many other contingencies the taxpayer could never recover any part of the excess payment." Burnet v. Hutchinson Coal Co., supra, at page 278 of 64 F.(2d).

Accordingly, the petitions of the taxpayer in the Fuller lease praying that the entire payments for minimum royalties be treated as ordinary and necessary business expenses are granted, and the orders of redetermination relating to that lease are reversed, and the petitions of the government to the contrary in the case of the Thaw lease are denied, and the orders of redetermination relating to that lease are affirmed.