UNITED STATES *v.* HILL ET UX.

No. 91–1421.   Argued November 2, 1992—Decided January 25, 1993

SOUTER, J., delivered the opinion for a unanimous Court.

*Kent L. Jones* argued the cause for the United States. With him on the briefs were *Solicitor General Starr, Acting Assistant Attorney General Bruton, Deputy Solicitor General Wallace, Ann Belanger Durney,* and *Charles Bricken.*

*Richard B. Robinson* argued the cause for respondents. With him on the brief was *Robert A. Wherry, Jr.**

JUSTICE SOUTER delivered the opinion of the Court.

Under §§ 56 and 57(a)(8) of the Internal Revenue Code of 1954, 26 U. S. C. §§ 56, 57(a)(8) (1976 ed.), a taxpayer must pay a "minimum tax" on the excess of the allowable depletion deduction for an interest in a mineral deposit over the taxpayer's adjusted basis for that interest. The question presented here is whether the term "adjusted basis," as used in § 57(a)(8), includes certain depreciable drilling and development costs identified in § 1.612–4(c)(1) of the Treasury Department regulations. We hold that the term does not cover such costs.

I

In 1981 and 1982, respondents William F. and Lola E. Hill were in the oil and gas exploration and production business, and, on their federal income tax returns for those respective years, they deducted $439,884 and $371,636 for depletion with respect to their interests in oil and gas deposits. Under 26 U. S. C. § 57(a)(8) (1976 ed.), the excess of the allowable depletion deduction for each of the deposit interests over the interest's "adjusted basis" is an "ite[m] of tax prefer-

---

*\*Timothy B. Dyk* filed a brief for the National Coal Association et al. as *amicus curiae* urging affirmance.

ence" on which a taxpayer must pay a "minimum tax" for the tax year in question.[1] See § 56(a). In determining the adjusted bases of their deposit interests, the Hills included not only the unrecovered portions of the amounts they originally paid to purchase the interests, but also the unrecovered costs of depreciable tangible items (machinery, tools, pipes, and so forth) used to exploit the deposits. Having thus reduced the amount of each item of tax preference under § 57(a)(8), they calculated and paid minimum taxes on those items of $29,812 for 1981 and $26,736 for 1982.

The Commissioner of Internal Revenue disputed the inclusion of the tangible costs in the deposits' adjusted bases, and assessed a larger minimum tax based on their exclusion. The Hills paid the resulting respective deficiencies of $30,963 and $18,733, and filed a refund claim, which the Commissioner denied. The taxpayers then sued the United States, petitioner here, for a refund in the Claims Court, which granted summary judgment in their favor. 21 Cl. Ct. 713 (1990). The Court of Appeals for the Federal Circuit affirmed. 945 F. 2d 1529 (1991). Because of the importance of the issue to the federal fisc, we granted certiorari. 503 U. S. 1004 (1992). We now reverse.

---

[1] All references to the Internal Revenue Code and related Treasury Regulations are to those that applied during the tax years at issue. The Treasury Regulations are cited as codified in the 1981 and 1982 editions of Title 26 of the Code of Federal Regulations. In the course of enacting the Internal Revenue Code of 1986, Congress redesignated § 57(a)(8) as § 57(a)(1) for taxable years beginning after 1986. See Tax Reform Act of 1986, Pub. L. 99–514, §§ 701(a) and 701(f)(1), 100 Stat. 2333, 2343. In October 1992, Congress enacted the Energy Policy Act of 1992, Pub. L. 102–486, 106 Stat. 2776. Section 1915(a) of that Act amends § 57(a)(1) of the Internal Revenue Code and provides that, for taxable years beginning after December 31, 1992, the depletion allowance permitted under § 613A(c) of the Code will not be treated as an item of tax preference subject to taxation as alternative minimum taxable income. See n. 3, *infra.*

## II

An oil and gas producer cannot ordinarily depreciate or otherwise recover (before disposition) his investment in land on which he drills wells because the process of producing his taxable income does not wear out or use up the land. See, *e. g.,* Treas. Reg. § 1.167(a)–2 (disallowing a depreciation deduction for "land apart from the improvements or physical development added to it"). Part of the purchase price of a fee simple interest in the land, however, represents investment in the right to extract any oil and gas from subsurface deposits, which (unlike the land) are "wasting assets," gradually depleted as the minerals are removed. An owner of such wasting assets, according to basic income tax theory, should accordingly be allowed a "reasonable allowance for depletion," 26 U. S. C. § 611(a) (1976 ed.), "to compensate [him] for the part exhausted in production, so that when the minerals are gone, the owner's capital and his capital assets remain unimpaired." *Paragon Jewel Coal Co.* v. *Commissioner,* 380 U. S. 624, 631 (1965).

To a degree, however, practice and theory have drifted apart. The Code and associated Treasury Department regulations require taxpayers to calculate depletion allowances by whichever of two methods produces the larger deduction for the current taxable year. Treas. Reg. §.1.611–1(a)(1); see also 26 U. S. C. § 613(a) (1976 ed.) ("In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section [concerning percentage depletion]"). The first method, "cost depletion," remains firmly moored to the rationale articulated in *Paragon Jewel.* Under that method, the taxpayer estimates the number of recoverable units in his mineral deposit, and deducts an appropriate portion of the deposit's adjusted basis for each unit extracted and sold. See Treas. Reg. §§ 1.611–2, 1.612–1. When the sum of prior deductions equals the cost or other basis of the deposit, plus allowable capital addi-

tions,[2] "[n]o further deductions for cost depletion shall be allowed." Treas. Reg. § 1.611–2(b)(2). The second method, "percentage depletion," has no such ties. It generously allows the taxpayer extracting minerals from a deposit to deduct a specified percentage of his gross income, even when his prior depletion deductions have exceeded his investment in the deposit. See 26 U. S. C. § 613 (1976 ed. and Supp. V); Treas. Reg. § 1.613–1. For the tax years at issue, percentage depletion produced the larger deduction for the Hills, and they accordingly calculated their depletion allowance according to that method.

For those tax years, however, percentage depletion's gleam is dimmed by the minimum tax.[3] Section 57(a)(8) of

---

[2] Allowable capital additions include intangible drilling and development costs that are "not represented by physical property," such as expenditures for clearing ground, draining, road making, surveying, geological work, grading, and the drilling, shooting, and cleaning of wells, to the extent that the taxpayer opts to capitalize these costs rather than deducting them as expenses. Treas. Reg. § 1.612–4(b)(1). For further discussion of these costs, see *infra*, at 563–564.

[3] The Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, § 201, 96 Stat. 411, repealed the "minimum tax" for noncorporate taxpayers for tax years beginning after December 31, 1982. See §§ 201(c)(1), 201(e)(1). At the same time, however, the Act also included items of tax preference, such as excess percentage depletion under § 57(a)(8), in the calculation of a taxpayer's "alternative minimum taxable income." § 201(a). While the "minimum tax" was simply added to the amount of income tax due under the normal provisions, the "alternative minimum tax" provision, 26 U. S. C. § 55 (1982 ed.), requires the recalculation of a taxpayer's income under a different set of rules. A tax is then imposed at a graduated rate on the taxpayer's "alternative minimum taxable income"; if the amount of alternative minimum tax so calculated is greater than the income tax calculated under the ordinary provisions, the taxpayer must pay both the normal tax and the amount by which his alternative minimum tax liability exceeds his ordinary tax liability. Because items of tax preference were added to "alternative minimum taxable income," the issue in this case continued to be relevant for tax years beginning after December 31, 1982. For the subsequent history of § 57(a)(8), see n. 1, *supra*.

the Code requires a taxpayer to calculate as a "tax prefer-
ence" "[w]ith respect to each [interest in a mineral deposit],[4]
the excess of the deduction for depletion allowable under sec-
tion 611 for the taxable year over the adjusted basis of the
[mineral deposit interest] at the end of the taxable year (de-
termined without regard to the depletion deduction for the
taxable year)." In turn, § 56 of the Code requires a tax-
payer to pay an extra minimum tax of 15% on the amount
by which the sum of the enumerated tax-preference items
in § 57(a) exceeds the specific deductions permitted by § 56.
Because the amount subject to the extra tax is reduced dollar
for dollar by every outlay that can be added to the adjusted
basis of the mineral deposit interest, a taxpayer would like
as long a list of eligible outlays as possible.

In this case the dispute is about the inclusion in the ad-
justed basis of certain tangible drilling and development
costs, as defined by the Treasury Regulations implementing
§§ 263(c) and 612 of the Code. Section 263(c) grants taxpay-
ers an option to deduct against current income certain "in-
tangible drilling and development costs." The regulations
limit the costs recoverable under that option by distinguish-
ing "intangible costs" from costs for "capital items," which
the parties refer to as "tangible costs":

> "The option with respect to intangible drilling and de-
> velopment costs does not apply to expenditures by
> which the taxpayer acquires tangible property ordi-

---

[4] Section 57(a)(8) applies to "each property (as defined in section 614)."
Section 614(a) defines "property," "[f]or the purpose of computing the
depletion allowance in the case of mines, wells, and other natural depos-
its," as "each separate interest owned by the taxpayer in each mineral
deposit in each separate tract or parcel of land." (The remainder of § 614
provides detailed rules about when a taxpayer may, and sometimes must,
combine separate interests and treat them as one "property.") Section
1.614–1(a) of the Treasury Department regulations makes the definition in
§ 614 applicable "[f]or purposes of subtitle A of the [Internal Revenue]
Code."

narily considered as having a salvage value. Examples of such items are the costs of the actual materials in those structures which are constructed in the wells and on the property, and the cost of drilling tools, pipe, casing, tubing, tanks, engines, boilers, machines, etc. . . . These are capital items and are returnable through depreciation." Treas. Reg. § 1.612–4(c)(1).[5]

It is the cost of such capital items as these, to the extent that they have not already been recovered through depreciation, that the Hills would like to add to the bases of their mineral deposit interests for purposes of calculating the amount of their percentage depletion deductions subject to the minimum tax.

## III

The taxpayers enter the race with a handicap. As we have noted, see n. 4, *supra*, § 57(a)(8) defines the "property" with which it is concerned by reference to § 614, which speaks in terms of the adjusted basis of "each separate interest owned by the taxpayer in each mineral deposit." 26 U. S. C. § 614(a) (1976 ed). A regulation defines "mineral deposit" as "minerals in place," Treas. Reg. § 1.611–1(d)(4), while a neighboring regulation defines another term, "mineral enterprise," to include "the mineral deposit or deposits *and improvements, if any, used in mining or in the production of oil and gas,*" Treas. Reg. § 1.611–1(d)(3) (emphasis added). Because these regulatory definitions were well established at the time Congress passed § 57(a)(8), see 25 Fed. Reg. 11796 (1960); Pub. L. 91–172, § 301, 83 Stat. 580, 582, we think it reasonable to assume that Congress relied on the accepted distinction between them in its reference to

---

[5] The regulations also foreclose the option with respect to the cost of "labor, fuel, repairs, hauling, supplies, etc., in connection with the operation of the wells and of other facilities on the property for the production of oil or gas." Treas. Reg. § 1.612–4(c)(2). These costs must be "charged off as expense." *Ibid.*

"mineral deposit" as contained in § 614. Thus the definitional scheme suggests strongly that the "property" we are concerned with in § 57(a)(8) excludes just those improvements that the Hills wish to treat as part of the property's adjusted basis.

They assert, however, (and the Government does not dispute) that the term "mineral enterprise" occurs in only that one operative provision in the regulations, Treas. Reg. § 1.611–1(d)(4), which concerns the allocation of a portion of the cost of a mineral enterprise to a mineral deposit or deposits. On that basis, the Hills argue that the term has the limited function of "assist[ing] in identifying depletable and depreciable costs when an operating mineral property is acquired as a unit." Brief for Respondents 18, n. 21. Consistently with that view, they note, a regulation implementing § 57(a)(8) directs us to "see section 1016 and the regulations thereunder . . . [f]or the determination of the adjusted basis of the property." Treas. Reg. § 1.57–1(h)(3). The computation of adjusted basis under 26 U. S. C. § 1016 (1976 ed. and Supp. V), they argue, is independent of the definition and function of "mineral enterprise" in the § 611 regulations; thus, the implications of this term's definition do not extend to the calculation at issue in this case.

We agree that § 1016 is the proper place to look for the rules concerning adjustment of basis; but we conclude that the computation of adjusted basis under § 1016 is wholly predicated on, rather than independent of, an understanding of "mineral deposit" as distinct from "improvements" within the meaning of the regulations under § 611.

Section 1016 is one of a number of general provisions that together determine the amount of gain or loss a taxpayer must recognize when he sells or otherwise disposes of any type of property. Section 1001(a) provides the basic rule: gain or loss is determined by subtracting "adjusted basis" from "amount realized." Section 1011(a) defines "adjusted basis" as "basis (determined under section 1012 [or other

parts of the Code]), adjusted as provided in section 1016."
Section 1016 provides the rules for making "[a]djustments
to basis."

The taxpayers, acknowledging the centrality of § 1016,
seize on the last phrase of a regulation addressing that
section:

> "The cost or other basis shall be properly adjusted for
> any expenditure . . . or other item, properly chargeable
> to capital account, including the cost of improvements
> and betterments made to the property." Treas. Reg.
> § 1.1016–2(a).

The ordinary meanings of the terms "improvements" and
"betterments," the Hills say, include all valuable additions to
property that are more than mere repairs; the tangible costs
that they have incurred to exploit their mineral deposits in-
crease the value of those deposits, and in any case are spe-
cifically referred to in the regulations implementing § 611 as
"improvements," see Treas. Reg. § 1.611–5; therefore, those
costs should be included in the adjusted basis of the mineral
deposit for purposes of § 1016.

The Hills' chosen passage, however, cannot carry the
weight they ask it to bear. The purpose of the phrase "in-
cluding the cost of improvements and betterments made to
the property" in Treas. Reg. § 1.1016–2(a) is not to provide
guidance in particular cases as to whether, for tax accounting
purposes, an expense should be added to the basis of an ex-
isting "property," or treated as a separate "property" of its
own. Rather, it is to ensure coordination of § 1016 with
§ 263, the Code section from which the term "improvements
and betterments" (which should probably be read as a unit)
is borrowed. Section 263(a)(1) provides that an expenditure
may not currently be deducted from income if it is "paid out
for new buildings or for permanent improvements or better-
ments made to increase the value of any property or es-

tate."[6]  26 U. S. C. § 263(a)(1) (1976 ed. and Supp. V). We have said that "[t]he purpose of § 263 is to reflect the basic principle that a capital expenditure may not be deducted from current income. It serves to prevent a taxpayer from utilizing currently a deduction properly attributable, through amortization, to later tax years when the capital asset becomes income producing." *Commissioner* v. *Idaho Power Co.*, 418 U. S. 1, 16 (1974). In turn, inclusion of the term "improvements and betterments" in Treas. Reg. § 1.1016–2(a) ensures the fulfillment of § 263's implicit promise: If a taxpayer cannot deduct an expenditure from current income because it has been deemed an "improvement or betterment" to property, he will be able to recover it later, either through a form of cost recovery such as depreciation or depletion, or upon sale as a deduction from the amount realized.[7]

---

[6] Section 263(a)(1) has one of the longest lineages of any provision in the Internal Revenue Code. The Revenue Act of 1864 included a provision specifying that "no deduction shall be made for any amount paid out for new buildings, permanent improvements, or betterments, made to increase the value of any property or estate." § 117, 13 Stat. 282. The wording of this provision remained the same in § 28 of the Revenue Act of 1894, 28 Stat. 553, and in § 2(B) of the Revenue Act of 1913, 38 Stat. 167. The current wording of the provision was adopted in the Revenue Act of 1918. See § 215(b) of the Revenue Act of 1918, 40 Stat. 1069. The language of Treas. Reg. § 1.1016–2(a) apparently originated in a passage in a House Committee Report on the Revenue Act of 1924, discussing the progenitor of 26 U. S. C. § 1016. See H. R. Rep. No. 179, 68th Cong., 1st Sess., 50 (1924) ("Under this provision capital charges, such as improvements and betterments . . . are to be added to the cost of the property in determining the gain or loss from its subsequent sale"). The forerunner to Treas. Reg. § 1.1016–2(a) was issued that same year. See Treas. Regs. 65, Art. 581 (1924).

[7] After tracing the word "improvement" from the regulations implementing § 611 through the regulations implementing § 1016 to the text of § 263, one might hope that § 263 itself would provide some insight into whether tangible development costs should be treated as an "improvement" to the mineral deposit, or as a separate property. Two circumstances dash this hope. First, as we said above, the phrase "improve-

Thus it is not by deciphering particular terms in the regulations accompanying § 1016 that the question in this case is answered, but by relying on the basic principles embodied in § 1016's directives. For our purposes, the most important mandate is found in § 1016(a)(2), which requires a taxpayer to subtract from his original basis in the property sold or exchanged "not less than the amount allowable [for exhaustion, wear and tear, obsolescence, amortization, and depletion] under this subtitle or prior income tax laws." In other words, whether or not the taxpayer ever took a depreciation, amortization, or depletion deduction with respect to the item he is selling, he must, for purposes of § 1016, determine whether such deductions were allowable with respect to that item, and reduce his basis by at least that allowable amount.[8]

To follow this directive, the taxpayer must determine whether parts of the item sold are subject to different tax treatments, and must treat those parts as different properties for purposes of § 1016. Thus, a taxpayer who bought an apartment building and the land it sits on for a single price must determine how much of that price went to pay for each, and must treat each cost as a separate asset for purposes of

---

ments and betterments," as used in the § 1016 regulations and in § 263, should probably be read as a single term unrelated to the term "improvements" in § 611 and the regulations thereunder. Second, § 263 is concerned only with identifying those payments that "serv[e] to create or enhance . . . what is essentially a separate and distinct additional asset." *Commissioner* v. *Lincoln Savings & Loan Assn.*, 403 U. S. 345, 354 (1971). So long as one can say that a payment must either be "creating" a separate asset or "enhancing" one that already exists, one need not, for purposes of § 263, identify which of these is the case. Here, we are presented with precisely that question.

[8] The directive is phrased "not less than the amount allowable" to account for the case in which a taxpayer has erroneously deducted *more* than that amount in a prior year. In that case, the taxpayer must reduce the basis by the greater amount actually deducted, to the extent that it resulted "(by reason of the deductions so allowed) in a reduction for any taxable year of [his] taxes." 26 U. S. C. § 1016(a)(2)(B) (1976 ed.); see § 1016(a)(2)(A).

§ 1016. This is so because the depreciation deduction allowable for the building (if the building is used to produce income) must, upon the sale or exchange of the property, be subtracted from the taxpayer's basis in the building whether the deduction was taken or not; but there is no subtraction from the land's basis since no such deduction is allowable for the land. See, e. g., Treas. Reg. § 1.167(a)–5 (requiring an apportionment of basis when a taxpayer has acquired "a combination of depreciable and nondepreciable property for a lump sum, as for example, buildings and land").

Although the Code and regulations allow some flexibility within such major categories of tax treatment,[9] the boundaries between the major categories are almost completely impassable. When a taxpayer is dealing with associated items falling into two different major categories, he cannot, as a general matter, choose to treat those items as a single property falling into one category or the other; a taxpayer may not, for example, decide to treat some or all of his apartment building as more land. Nor may a taxpayer choose to add "improvement" costs to the basis of whichever item he pleases: some costs, say of a new roof, must be treated as adding to the value of the depreciable building (or as separate depreciable assets), whereas other costs, like that of grading a building site, must be treated as additions to the value of the nondepreciable land. See, e. g., Rev. Rul. 74–265, 1974–1 Cum. Bull. 56 (distinguishing between depreciable and nondepreciable improvements to land).

Depletion and depreciation are two of these major categories of tax treatment. As this Court said almost a half-

---

[9] For example, a taxpayer may set up a depreciation account for a new furnace separate from that of the account of the building in which it is installed; he may also, under some circumstances, set up a "composite" account which combines the cost of the building with the cost of "improvements," such as the furnace. See generally Treas. Reg. § 1.167(a)–7 (describing "group," "classified," "composite," and component accounts for depreciable property).

century ago, "[t]h[e] distinction between depletion and depreciation runs through the basis provisions of the [Internal Revenue Code]." *Choate* v. *Commissioner*, 324 U. S. 1, 3 (1945). Thus, the Code's depreciation allowance "does not apply to natural resources which are subject to the allowance for depletion provided in section 611." Treas. Reg. § 1.167(a)–2. Accordingly, § 611 itself carefully appends, to its provision for "a reasonable allowance for depletion" in the case of natural deposits and timber, the qualification "and for depreciation of improvements, according to the peculiar conditions in each case."[10] 26 U. S. C. § 611(a) (1976 ed.); see Treas. Reg. § 1.611–5(a). To implement this distinction, the regulations under § 611, mentioned above, separately define "mineral deposit" as "minerals in place," Treas. Reg. § 1.611–1(d)(4), and "mineral enterprise" as including "the mineral deposit or deposits and improvements," § 1.611–1(d)(3). The section defining "mineral deposit" then further provides that "[w]hen a mineral enterprise is acquired as a unit, the cost of any interest in the mineral deposit or deposits is that proportion of the total cost of the mineral enterprise which the value of the interest in the deposit or deposits bears to the value of the entire enterprise at the time of its acquisition." Treas. Reg. § 1.611–1(d)(4); see also § 1.611–2(g)(2)(vii) (requiring a statement to be attached to the taxpayer's return showing "[a]n allocation of the cost or value among the mineral property, improvements and the surface of the land for purposes other than mineral production"). These provisions are designed to isolate those portions of the cost of a "mineral enterprise" that are subject to recovery through depletion.

Thus, just as one generally cannot calculate an adjusted basis under § 1016 by treating an apartment building as "more land," one generally cannot treat tangible tools and

---

[10] As we have noted, see n. 7, *supra*, the word "improvements" carries a different meaning here than it does within the term "improvements or betterments" as used in § 263(a).

equipment as "more mineral deposit." If a mineral deposit and associated equipment are sold together, § 1016 requires the seller to separate them for the purpose of determining his gain or loss on the sale, just as §§ 167 and 611 required him to keep them separate for the purpose of calculating his depreciation and depletion deductions. Since, as the Hills point out, a regulation incorporates the § 1016 rule into § 57(a)(8), and since the Hills have identified no exception to this rule, we infer that the Hills' tangible costs may not be included in the basis of depletable mineral deposits for purposes of calculating the amount of percentage depletion subject to the minimum tax.

## IV

Our conclusion is confirmed by the astonishing, circuitously achieved results of reading § 57(a)(8) as the taxpayers urge. A regulation that the Hills do not challenge provides that "[i]n no event shall percentage depletion in excess of cost or other basis of the property be credited to the improvements account or the depreciation reserve account." Treas. Reg. § 1.611–2(b)(2). The tangible costs at issue here are recorded in these accounts. Thus, under this regulation, a tangible cost is not itself adjusted for the amount of percentage depletion that on the Hills' theory it would shelter from the minimum tax each year. As a result, the tangible cost would shelter, over the years the taxpayer owned the capital item it represented, an amount of percentage depletion many times that of the cost itself. For example, a $21,000 capital item, subject to straight-line depreciation over 20 years with a salvage value of $1,000, would add $20,000 to the basis of the mineral deposit the first year,[11]

_____

[11] Under § 57(a)(8), percentage depletion is offset by "the adjusted basis of the [mineral deposit interest] *at the end of the taxable year.*" (Emphasis added.) Assuming that the capital item was placed in service at the

$19,000 the second year, and so on for 20 years. At the end of the 20th year, the item would be fully depreciated, and the taxpayer's basis in the item would then remain at $1,000, the salvage value, for as many more years as he continued to own it. Thus, over the first 20 years, the capital item would shelter $210,000, or 10 times its cost, from the minimum tax; beginning in the 21st year, it would shelter $1,000 per year for as long as it remained in the taxpayer's hands. At a minimum tax rate of 15%, a taxpayer would realize a tax benefit, from his $21,000 investment, of $31,500 over the first 20 years from § 57(a)(8) alone, without regard to the additional tax benefit from ordinary depreciation of the item. It is hard to believe that Congress would enact a minimum tax to limit the benefit that taxpayers could realize from "items of tax preference," only to define one of those items in a way that would create an even greater proportional tax benefit from investing in tangible items, and to do so in an oblique fashion that, as far as we know, has no precedent in the history of the federal income tax.

## V

The Hills contend that two Treasury Department regulations we have not yet discussed foreclose our conclusion. They point first to one of the cost depletion regulations under § 612, which, but for its title and one adjective, would independently reinforce our conclusion:

> "The basis for cost depletion of mineral or timber property does not include:

---

beginning of a taxable year, by the end of the year the taxpayer's basis in it would be reduced by the first year's depreciation. Thus, in our example, the $21,000 capital item would add $20,000 to the taxpayer's basis in the mineral deposit, for purposes of § 57(a)(8), the first year it was placed in service.

"(i) Amounts recoverable through depreciation deductions, through deferred expenses, and through deductions other than depletion, and

"(ii) The residual value of land and improvements at the end of operations." Treas. Reg. § 1.612–1(b)(1).

This, of course, is exactly the conclusion in the case of percentage depletion that we have reached after a long detour through § 1016. Section 1.612–1(b)(1) applies by its terms, however, only to the determination of mineral deposit basis for the purpose of calculating *cost* depletion; and the title of § 1.612–1(b) is *"Special rules."* Therefore, reason the Hills, the "general rule" for determining mineral deposit basis under § 1016 must include the items, such as "[a]mounts recoverable through depreciation deductions," excluded in the "special rule." But this argument proves too much. If the Hills stuck to their logic, they would have to claim that they could also add "[t]he residual value of land and improvements at the end of operations" to their bases in their mineral deposit interests, an absurdity that they cannot, and do not try to, support. The simple answer is that when an arguable suggestion of the title of one subsection of a regulation is pitted against the entire Code framework for determining basis, the Code wins, and the title is at most an infelicity.

The infelicity is understandable here. The calculation of percentage depletion is unconnected to the concept of basis; the annual percentage depletion deduction is not measured in relation to basis, nor are the cumulative deductions limited by basis. See 26 U. S. C. § 613 (1976 ed. and Supp. V). The concepts of basis and percentage depletion meet only in the minimum tax provisions, for the purpose of calculating the item of tax preference in § 57(a)(8). Since § 1.612–1(b)(1) was issued long before the minimum tax was enacted, see 25 Fed. Reg. 11801 (1960); Pub. L. 91–172, § 301, 83 Stat. 580, that regulation's reference to a "special rule" for "cost" depletion cannot have been intended to indicate that some

other rule applied to the calculation of basis for percentage depletion. After the minimum tax was enacted, the Treasury Department inserted a regulation about basis for percentage depletion where one would expect it: among the regulations implementing the minimum tax. That regulation, § 1.57–1(h)(3), directs us to § 1016, but unfortunately contains no correlative reference to the regulations under § 612.

Second, the Hills argue that excluding tangible costs from the adjusted basis of their mineral deposit interests would run counter to regulations specifying the inclusion of certain intangible costs. As we have already noted, 26 U. S. C. § 263(c) (1976 ed., Supp. V) grants taxpayers an option to deduct as expenses certain "intangible drilling and development costs." If a taxpayer chooses instead to capitalize those costs, the regulations require the taxpayer to sort the costs into two bins. Costs "represented by physical property" are recoverable through depreciation, either through adjustments to the bases of pre-existing items to which the costs relate, or through an initial entry in a new depreciation account. Treas. Reg. § 1.612–4(b)(2). Costs "not represented by physical property" are recoverable through depletion, as adjustments to the bases of the mineral deposit interests to which they relate. § 1.612–4(b)(1); see § 1.612–4(d) (if a taxpayer fails to elect to expense intangible costs correctly, "he shall be deemed to have elected to recover such costs through depletion to the extent that they are not represented by physical property, and through depreciation to the extent that they are represented by physical property"). Since these latter costs are added to depletable basis, the taxpayers argue, so should the tangible costs that are excluded altogether from the § 263(c) option. We fail to see the logic of this argument. To the extent that the regulation allowing intangible costs "not represented by physical property" to be added to a mineral deposit's basis deviates from general principles of basis allocation, we see no reason why

one deviation should force the Government, or this Court, to create another. Nor have the Hills explained why this regulation in fact represents a deviation.[12]

The judgment of the Court of Appeals is

*Reversed.*

---

[12] The taxpayers also cite Internal Revenue Service Technical Advice Memorandum 8314011 (Dec. 22, 1982), which holds that unamortized deferred development expenditures under § 616 of the Code are included in the basis of a mineral deposit for purposes of § 57(a)(8). As respondents acknowledge, the Code specifically provides that such memoranda "may not be used or cited as precedent." 26 U. S. C. § 6110(j)(3) (1976 ed.). In any case, § 616 sets up a system for the treatment of development expenditures entirely different from the system at issue here; in particular, § 616(c) specifically mandates that expenses deferred under § 616(b) "shall be taken into account in computing the adjusted basis of the mine or deposit." Thus, Technical Advice Memorandum 8314011 simply is not relevant to the question presented in this case.