**RELIANT ENERGY INCORPORATED and Subsidiaries, Plaintiff,**

v.

**The UNITED STATES, Defendant**

**No. 92–871 T.**

United States Court of Federal Claims.

Nov. 24, 1999.

Richard A. Husseini, Baker & Botts, Houston, Texas, attorney of record for plaintiff, with whom was Gregory V. Nelson, of counsel.

Benjamin C. King, Jr., Washington, D.C., Department of Justice, Tax Division, with whom was Assistant Attorney General Loretta C. Argrett, for defendant.

## OPINION

ALLEGRA, Judge.

This tax refund suit is before the court on cross-motions for partial summary judgment. Plaintiff argues that a $500,000 advanced royalty payment it made in 1985 was currently deductible either as: (i) an advanced minimum royalty under Treas. Reg. § 1.612–3(b)(3); (ii) a delay rental payment under Treas. Reg. § 1.612–3(c); or (iii) an ordinary and necessary business expense under section 162 of the Internal Revenue Code of 1954 (26 U.S.C.). Following oral argument, and after careful consideration of the briefs and submissions of both parties, this court holds that the $500,000 payment was not currently deductible. This court, therefore, DENIES plaintiff's motion for partial sum-

mary judgment and GRANTS defendant's cross-motion.

## I. Facts

The relevant facts in this case are not in dispute. On June 17, 1980, Enserch Exploration, Inc. (Enserch) and the North American Coal Company (NACCO) entered into an agreement whereby NACCO was given an option to purchase all of Enserch's coal and lignite reserves in Henderson County, Texas. NACCO required a substantial supply of the strip-mined mineral to operate, in conjunction with the Getty Coal Company, a "mine mouth" power plant[1] in Henderson County. NACCO purchased the right to these minerals due to concerns that the lignite contained in its Trinity mine, also jointly owned with Getty, would be insufficient to operate the plant.

The agreement provided, in relevant part, that, if NACCO exercised the option to purchase the lignite, it was obligated to pay Enserch an "advance minimum royalty" of $2,000,000 per year, beginning at the timing of the closing of transaction and for 19 years subsequent thereto. This "advance minimum royalty" payment was entirely recoupable from overriding production royalties, set at $1 per ton of lignite produced or sold from the property.[2] This agreement also provided for the cessation of such royalty payments once either the advance royalties or the production royalties reached a ceiling of $40,-000,000. The royalty payments could also be ended by terminating the option agreement. On December 29, 1980, NACCO exercised its option and paid Enserch the first $2,000,000 advance royalty.

On November 20, 1984, NACCO and Enserch amended the advance royalty agreement, reducing the required advance royalty from $2,000,000 to $500,000 for a five year period, allegedly because of reduced market demand for lignite. The amendment also provided that, upon the termination of this five year period of reduced royalty payments, the minimum royalty would increase to its previous level of $2,000,000 a year.[3]

On August 29, 1985, Utility Fuels, Inc. (UFI), a subsidiary of the plaintiff, purchased Getty's 55% interest in the Trinity mine. On December 10, 1985, UFI entered into an agreement with NACCO whereby UFI assumed NACCO's 45% interest in the Trinity mine. Now owner of the entire Trinity site, UFI assumed all rights and obligations under the amended agreement with Enserch. In 1985, UFI paid the $500,000 advance royalty required under the option contract, the second of the reduced payments under the amendment. No lignite was mined and supplied to UFI pursuant to the option agreement during 1985.

On its 1985 corporate tax return, plaintiff deducted the $500,000 paid that year to Enserch. The Internal Revenue Service disallowed the deduction in its entirety. Plaintiff paid the tax owed in respect to the disallowed royalty deduction and, in 1992, filed a claim for refund that covered this amount. After the Service failed to act on the claim, plaintiff filed suit in this court on December 28, 1992, raising nineteen separate issues,

---

1. A 'mine mouth' plant is essentially an electrical generating facility using as fuel a mineral, such as lignite, which is so poor a source of energy as to make transport of the mineral economically unviable. Thus the plant is built directly at the mouth of the mine providing the fuel supply.

2. Under the option agreement, the $1 overriding production royalty was adjusted each year based on various indices (i.e., the cost of labor) of the Consumer Price Index (CPI).

3. In actual terms, the amendment provided as follows:

   1. For a period of five (5) years, beginning with the Advance Royalty payment which becomes due and payable on December 29, 1984 in accordance with paragraph 6.a. of the Option Agreement, the annual Advance Royalty payments shall be reduced from Two Million Dollars ($2,000,000.00) to Five Hundred Thousand Dollars ($500,000.00) which shall be due and payable on the 29th day of December of each year from 1984 through 1988, up to and including the payment which shall be due and payable on December 29, 1988.

   2. From and after the final, reduced Advance Royalty payment which shall be due and payable on December 29, 1988 as hereinabove provided, the annual Advance Royalty payments will increase to Two Million Dollars ($2,000,000.00) as required by the terms and provisions of the Option Agreement which shall continue in full force and effect as written, except as modified herein.

one of which was the disallowed royalty deduction. Eighteen of the nineteen counts contained in the original complaint have been settled or dismissed; only the claim relating to the denied advance royalty deduction remains.

## II.  Discussion

### A.  "Advanced Minimum Royalty"

■ For federal income tax purposes, a royalty interest is a right to minerals in place that entitles the owner thereof to a specified fraction of the total production from the property free of the expense of development and operation. Frank M. Burke & Robert W. Bowhay, *Income Taxation of Natural Resources* § 2.03 (1985). Royalties traditionally have been described as akin to rent and are deductible by the payor as a trade or business expense under section 162 of the Internal Revenue Code (26 U.S.C.). *See Helvering v. Russian Finance & Construction Corp.,* 77 F.2d 324, 328 (2d Cir.1935); *Commissioner v. Jamison Coal & Coke Co.,* 67 F.2d 342, 344 (3d Cir.1933); *Burnet v. Hutchinson Coal Co.,* 64 F.2d 275, 277 (4th Cir.1933), *cert. denied,* 290 U.S. 652, 54 S.Ct. 69, 78 L.Ed. 565 (1933); *Surloff v. Commissioner,* 81 T.C. 210, 232, 1983 WL 14861 (1983).

■ "Advanced minimum royalties" refer to minimum royalties payable annually under a lease which are designed "to encourage the lessee to begin production as quickly as possible." Burke & Bowhay, *supra,* § 18.22. *See also Ferrell v. Commissioner,* 90 T.C. 1154, 1204, 1988 WL 59903 (1988); David L. Hallet, *Lease Bonuses, Advanced Royalties, and Delay Rentals—Federal Income Tax Consequences of Lessors and Lessees,* 18 Gonz. L.Rev. 101, 111–18 (1983). Amounts paid pursuant to an advanced minimum royalty provision are treated as a credit against future "earned royalties," i.e., royalties paid upon actual production. *See Davis*

*v. Commissioner,* 746 F.2d 357, 359 (6th Cir. 1984). *See also Wood v. United States,* 377 F.2d 300, 307 (5th Cir.1967), *cert. denied,* 389 U.S. 977, 88 S.Ct. 465, 19 L.Ed.2d 472 (1967); Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* 432 (9th ed.1994). An advance minimum royalty provision is normally designed to approximate the amount of royalties that would accrue at a certain level of production and benefits the lessor by providing an impetus for the lessee to begin production as soon as possible. *See, e.g., Wing. v. Commissioner,* 81 T.C. 17, 38 n. 28, 1983 WL 14849 (1983).[4]

■ Under Treas. Reg. § 1.612–3(b)(3), advanced minimum royalties are generally deductible only in the year the mineral product to which they relate is sold. *See, e.g., Brown v. Commissioner,* 799 F.2d 27, 29 (2d Cir.1986). Were there no exceptions to this rule, no portion of UFI's advance royalty payment in 1985 would be currently deductible because no production occurred that year. However, the regulation also allows a current deduction for advanced royalties paid or accrued "as a result of a minimum royalty provision." A minimum royalty provision is defined in the regulation as follows:

§ 1.612–3 *Depletion; treatment of bonus and advanced royalty*

   *   *   *   *   *   *

(b) *Advanced royalties.* * * *

   *   *   *   *   *   *

(3) * * * For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount.

---

4.  An advance minimum royalty must be distinguished from a lease bonus, which is a payment made as an inducement for the lessor to enter into the mineral sublease, and is not recoupable out of future production. *See* Burke & Bowhay, *supra,* § 18.22; Rev. Rul. 72–165, 1972–1 C.B. 177. Lease bonuses are not deductible when paid, but rather must be amortized over the life

of the sublease. *See Canadian River Gas Co. v. Higgins,* 151 F.2d 954, 956 (2d Cir.1945), *cert. denied,* 327 U.S. 793, 66 S.Ct. 818, 90 L.Ed. 1019 (1946); *Sunray Oil Co. v. Commissioner,* 147 F.2d 962, 966 (10th Cir.1945), *cert. denied,* 325 U.S. 861, 65 S.Ct. 1201, 89 L.Ed. 1982 (1945). *See also* Treas. Reg. § 1.162–3(a)(3).

As the quoted language indicates, advanced minimum royalties thus must be annual, substantially uniform payments. *See Ward v. Commissioner,* 784 F.2d 1424, 1427 (9th Cir. 1986); *Maddrix v. Commissioner,* 780 F.2d 946, 950 (11th Cir.1986). *See also* John Mertens, *Law of Federal Income Taxation* § 24.36 (1997).

The deductibility of the payment in question thus hinges on whether the option agreement, as amended, requires substantially uniform minimum royalty payments. In *A.B. Long v. United States,* 10 Cl.Ct. 46 (1986), *aff'd,* 824 F.2d 976, 1987 WL 37876 (Fed.Cir. 1987), this court looked closely at the substantial uniformity requirement of section 1.612–3(b)(3). In that case, a limited partnership challenged the Service's determination that it could not take a current-year deduction for payment of advanced royalties pursuant to what it claimed was a minimum royalty provision of a sublease. *Id.* at 47. The minimum royalties called for by this provision varied between $1,000,000 and $500,000, with an initial royalty of $1,000,000, followed by a series of eleven annual payments beginning at $500,000 and ending, once again, at $1,000,000. *Id.*[5] Finding that the plaintiff could not "escape the plain meaning of [a] term like substantially uniform," the court concluded that a "range of payments from $1,000,000 to $500,000 is not substantially uniform." *Id.* at 62.

In addition to the *A.B. Long* case, two revenue rulings[6] deal specifically with whether advanced royalty payments are "substantially uniform." In Rev. Rul. 79–381, 1979 C.B. 244, a taxpayer-lessee agreed to make payments of $450x in the first lease year, as an advanced payment recoupable from future production royalties. In subsequent years, the taxpayer agreed to pay an amount equal to 75 percent of the average of the previous three years' production multiplied by a royalty of z dollars. The Service held that the initial payment, as well as the subsequent formula-based payments, were not advanced minimum royalties under section 1.612–3(b)(3) because "subsequent production could vary so substantially that the payments based on an any moving average would not result in uniformity." Accordingly, the election to deduct currently such payments was held not available.

In Rev. Rul. 81–299, 1981–2 C.B. 138, the lessee agreed to make annual payments of 5x dollars, which were to be adjusted in accordance with the consumer price index (CPI). In concluding that such variations did not prevent the payments from being "substantially uniform," Rev. Rul. 81–299 began by distinguishing Rev. Rul. 79–381, indicating that the formula there, based upon coal production, "put control in the hands of the sublessee and could produce wide variations in the minimum advanced payments." By comparison, the ruling observed that the advance royalty payment in question was "a fixed amount so far as the parties are concerned," whose fluctuation was "outside the control of the parties to the lease." In addition, the ruling noted that the application of the CPI adjustment "does not give rise to large aggregate payments in the earlier years and thus meets the 'substantially uniform' requirement of … the regulation." It described the latter requirement as "intended to discourage arrangements that result in large aggregated payments designed to give rise to disproportionately large deductions in the early years of the lease."

■ Several observations may be distilled from these authorities. First, based upon

---

5. The defendant in *A.B. Long* argued that the sublease required an initial royalty payment of $1,417,000. However, the plaintiffs countered that only $1 million of this amount actually had to be paid in the first year. Avoiding this potential question of fact, the court concluded that it would use the $1 million figure for purposes of resolving the motion for summary judgment.

6. Revenue rulings typically contain the Service's interpretation of how the law applies to a commonly encountered set of hypothetical facts. Though not as broad in application as regulations, revenue rulings are considered authoritative. *See* Rev. Proc. 96–1, 1996–1 C.B. 385. *See also Bankers Life and Casualty Co. v. United States,* 142 F.3d 973, 977 (7th Cir.1998). Though courts differ greatly in the deference they afford such rulings, this court has held that they provide "some guidance as to the correct interpretation of the Internal Revenue Code." *Ridenour v. United States,* 3 Cl.Ct. 128, 137 (1983). *See also St. Louis Bank for Cooperatives v. United States,* 224 Ct.Cl. 289, 624 F.2d 1041, 1050 (1980).

*A.B. Long* and a plain reading of Treas. Reg. § 1.612–3(b)(3), it appears that, as a threshold matter, the determination of whether a stream of minimum royalty payments are "substantially uniform" is made by comparing the highest and lowest payments required by the lease or sublease. However, the revenue rulings instruct that in some cases—specifically, where the amount of the royalty payment varies based on a preexisting formula outside the control of the parties to the sublease—a stream of royalty payments may be deemed "substantially uniform" even though in absolute dollars the payments vary, perhaps significantly, from year to year.[7] *See* Mertens, *supra*, § 24.36 ("The major distinction [in Rev. Rul. 81–299] was that inflation, which drives the consumer price index, is not within the taxpayer's control while in Rev. Rul. 79–381 ... the payment formula was under the lessee's control").

■ Certainly, if we focus on the relative magnitude of the payments here, it is readily observable that the amount of the royalties in question varied significantly—from $500,-000 to $2 million. The variance in the case *sub judice*, indeed, is greater than that deemed not "substantially uniform" in *A.B. Long*. Plaintiff, however, argues that its situation is analogous to that of the taxpayer in Rev. Rul. 81–299. It contends that the variation in the amount of the annual advance royalty was due to a factor outside the control of the parties to that agreement, namely,

the depressed demand for lignite in Texas in 1984. But, while the fluctuations in price in the lignite market may have been outside the parties' control, the decision to amend the option agreement, as well as the specifics of the amendment itself, were certainly matters within their control. Had the original option included a provision that adjusted the advanced royalty payment in accordance with some independent measure of the price of lignite or other gauge of inflation, such a provision might well have qualified under the regulations. Indeed, the option in question employed such a provision in adjusting the production royalties according to various indices of the CPI. But, that is not how the amended "minimum royalty provision" at issue was constructed. Rather, the nature of what occurred here is that the parties to the amendment exercised control over the amount of the royalties and, through that control, set the amount of the royalties at substantial differing levels. For that reason, the analysis of Rev. Rul. 81–299 is unavailing.[8]

Seeking to sidestep this straightforward application of the regulation, plaintiff stresses that its transaction was neither tax motivated nor in the nature of a tax shelter. To be sure, a phalanx of decisions holds that leases that include inflated initial royalty obligations that taper off over time, often dischargeable through nonrecourse notes secured only by the underlying mineral lease, do not provide for the payment of substan-

---

7.  Defendant asserts that one reason that the CPI provision in Rev. Rul. 81–299 did not prevent the payments there from being deemed "substantially uniform" was that the royalty amounts did not vary significantly as a result of this inflation factor. A simple example, however, illustrates this is not necessarily true. For example, if a sublease for twenty years called for an initial advanced minimum royalty payment of $100, adjusted for subsequent years by an inflation factor of 4 percent per year, the last annual royalty payment due under that lease would be approximately $219—more than double the initial payment. Accordingly, it would appear that Rev. Rul. 81–299 was not focused on the relative magnitude of the minimum royalty payments, but rather on the fact that any variation in those payments was the result of a formula not under the parties' control.

8.  Plaintiff argues that "[p]rudent parties in such circumstances would have renegotiated the

terms of the agreement to maximize their economic position." Rev. Rul. 81–299, however, does not establish a "business purpose" exception to the regulations' requirement of substantial uniformity. Thus, it is irrelevant that economic conditions may have motivated the amendment—what is relevant is that the parties exercised control in negotiating and adopting the amendment, thereby bringing this case outside the ambit of Rev. Rul. 81–299 and any reasonable extension thereof. In arguing for a relaxed control test, plaintiff also cites Private Letter Ruling 8452044. While this ruling does not support plaintiff's position, it is important to note that the Internal Revenue Code specifically provides that such letter rulings "may not be used or cited as precedent." 26 U.S.C. § 6110(j)(3). *See United States v. Hill*, 506 U.S. 546, 564 n. 12, 113 S.Ct. 941, 122 L.Ed.2d 330 (1993).

tially uniform royalties, as required by section 1.612–3(b)(3). *See, e.g., Howe v. Commissioner,* 814 F.2d 98, 100–01 (2d Cir.1987), *cert. denied,* 484 U.S. 895, 108 S.Ct. 227, 98 L.Ed.2d 186 (1987); *Maddrix,* 780 F.2d at 950–51; *Ward,* 784 F.2d at 1426–28; *Oneal v. Commissioner,* 84 T.C. 1235, 1240–41, 1985 WL 15359 (1985); *Wing,* 81 T.C. at 40. But, the fact the amendment in question lacks the types of provisions deemed disqualifying in these cases does not mean that, *a fortiori,* it automatically qualifies as "advanced minimum royalty provision." Rather, accepting, *arguendo,* that the transaction in question was bona fide, it remains that the amendment does not require the payment of "substantially uniform" royalties and, for that reason, does not qualify as "an advanced minimum royalty provision." [9] As such, the $500,000 payment in question is not deductible under section 1.612–3(b)(3).

### B. Delay Rental

■ Alternatively, plaintiff argues that the payment in question constituted a "delay rental" deductible under Treas. Reg. § 1.612–3(c). Regarding this form of mineral lease payment, the regulation provides that "[a] delay rental is an amount paid for the privilege of deferring development of the property and which could have been avoided by abandonment of the lease, or by commencement of development operations, or by obtaining production." Treas. Reg. § 1.612–3(c). In short, "[a] delay rental is the equivalent of ordinary rent for income

tax purposes." Mertens, *supra,* § 24.42. Plaintiff argues that its payment of $500,000, if not paid pursuant to an advanced minimum royalty provision, was, in essence, a "payment for the privilege of deferring development of the mining property," and, thus, is a "delay rental."

However, the record does not demonstrate the existence of a "delay rental." Delay rentals buy only time. They "accrue by the mere lapse of time like any other rent" and are "not paid directly or indirectly for [minerals] to be produced, but [are] for additional time in which to utilize the land." *Commissioner v. Wilson,* 76 F.2d 766, 769 (5th Cir. 1935). *See also Fredkin v. Commissioner,* 870 F.2d 801, 805 (1st Cir.1989). Because they only buy time, delay rentals are not recoupable by the lessee out of production, as are royalty payments. *See McFaddin v. Commissioner,* 2 T.C. 395, 403, 1943 WL 32 (1943)("If the payments had been made and accepted for delay in exploring and developing the premises, the lessee would have no right to reimbursement out of the royalties produced").[10] Here, plaintiff must pay the "minimum royalty" whether or not it produces lignite—that is, it must pay even it begins production. Further, its payments are recoupable out of future production. As such, the "minimum royalty" represents an interest in the mineral place and, as such, cannot be a "delay rental" within the meaning of the Treasury Regulations. *See Fredkin,* 870 F.2d at 805; *McFaddin,* 2 T.C. at 403.[11]

9. Plaintiff seizes upon the language in Rev. Rul. 81–299 stating that the "substantially uniform" requirement was intended to "discourage arrangements that result in large aggregated payments designed to give rise to disproportionately large deductions in the early years of the lease." It argues that its agreement did not give rise to such payments. This assertion is debatable because, viewed over its entire life, the agreement plaintiff assumed from NACCO began with payments of $2 million that were later reduced. More importantly, the language quoted by the plaintiff does not constitute the rationale for the ruling, which instead focused on the lack of control exercised by the taxpayer under the CPI clause that automatically adjusted the advanced minimum royalties. In effect, plaintiff thus relies on "dicta" in a revenue ruling as grounds for this court to overlook the "substantially uniform" requirement and essentially rewrite the regulation

to disallow only nonuniform royalties highly inflated in the early years of a lease. However, this surely does constitute a basis for this court to depart from the language of a longstanding Treasury Regulation, which has repeatedly been held valid. *See Wendland v. Commissioner,* 739 F.2d 580 (11th Cir.1984) (upholding the validity of § 1.613–3(b)(3)); *Redhouse v. Commissioner,* 728 F.2d 1249 (9th Cir.1984), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 506, 83 L.Ed.2d 397 (1984). Indeed, plaintiff makes no argument that the regulation is invalid.

10. *See also* Alexander J. Bruen, et al., *Federal Income Taxation of Oil and Gas Investments* § 3.03[1] (2d ed.1989); Hallet, *supra,* at 116 ("Delay rentals are not considered to be paid to the lessor as an advance recoupable from future production.")

## C. Ordinary and Necessary Business Expense

Lastly, plaintiff claims that the payment in question is deductible as an "other payment" under Section 162(a)(3) of the Code. The latter provision provides, in pertinent part, for the current deduction of "ordinary and necessary expenses" paid or incurred in a trade or business, including:

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or *in which he has no equity.*

I.R.C. § 162(a)(3) (emphasis added). In the instant case, the "minimum royalty" paid by plaintiff essentially gave it an equity interest in the mineral in place. *See Transamerica Corp. v. United States,* 15 Cl.Ct. 420, 436 (1988) (holding that payments yielding an equity interest do not qualify for deduction under section 162(a)). Accordingly, this payment does not qualify for current deduction under section 162(a)(3).[12]

## III. CONCLUSION

It has been artfully stated that "[h]istory, economics, politics, and compromise are the timbers supporting [the] present construction of the Code and Regulations dealing with [mineral] taxation." *White Castle,* 481 F.2d at 1278 (Goldberg, J., concurring). Their genesis aside, the geodetics of the instant case derive simply from a controlling Treasury Regulation, the plain meaning and reasonable construction of which bars the deduction in question. For the foregoing reasons, plaintiff's Motion for Partial Summary Judgment is DENIED and defendant's Cross-Motion for Partial Summary Judgment is GRANTED.

---

11. In arguing to the contrary, plaintiff relies on Judge Goldberg's concurring opinion in *White Castle Lumber & Shingle Co. v. United States,* 481 F.2d 1274, 1276 (5th Cir.1973). However, that opinion merely states that amounts that can be avoided by abandoning the lease are delay rentals, even if such obligations cannot be avoided by beginning production. *Id.* Notably, Judge Goldberg's opinion also restates the principle that delay rentals are not paid directly or indirectly for the mineral to be produced, i.e., they are not recoupable. *See* 481 F.2d at 1276.

12. This interpretation of section 162(a)(3) underlies the general rule in Treas. Reg. § 1.612–3(b)(3) of the regulations, which, as previously noted, provides that "[t]he payor shall treat the advanced royalties so paid or accrued in connection with the mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold." Treas. Reg. § 1.612–3(b)(3).